UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 12-2279**

AI HUA CHEN; JIN XIU LI,

　　　　　　Petitioners,

　　　v.

ERIC H. HOLDER, JR., Attorney General,

　　　　　　Respondent.

On Petition for Review of an Order of the Board of Immigration
Appeals.

Argued: September 19, 2013　　　Decided: February 5, 2014

Before TRAXLER, Chief Judge, and MOTZ and KEENAN, Circuit
Judges.

Petition for review granted in part and denied in part by
published opinion. Chief Judge Traxler wrote the opinion, in
which Judge Motz and Judge Keenan concurred.

**ARGUED:** Alexa Taiz Torres, LAW OFFICE OF RICHARD TARZIA, Belle
Mead, New Jersey, for Petitioners. Walter Bocchini, UNITED
STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.
**ON BRIEF:** Gregory Marotta, LAW OFFICE OF RICHARD TARZIA, Belle
Mead, New Jersey, for Petitioners. Stuart F. Delery, Principal
Deputy Assistant Attorney General, Civil Division, Carl H.
McIntyre, Jr., Assistant Director, Christina J. Martin, Office
of Immigration Litigation, UNITED STATES DEPARTMENT OF JUSTICE,
Washington, D.C., for Respondent.

TRAXLER, Chief Judge:

Petitioners Ai Hua Chen and Jin Xiu Li, both natives of China's Fujian Province, met and married in the United States and are the parents of two children born to them here. Chen and Li admit they are subject to removal, but seek asylum and withholding of removal on the basis that one or both of them will be persecuted for having violated China's one-child policy. The couple also seeks asylum and withholding of removal on the grounds that they will face persecution for their Christian faith upon returning to China. Despite finding both Chen and Li to be credible witnesses, the immigration judge ("IJ") and the Board of Immigration Appeals ("BIA"), relying on an often-cited 2007 State Department report, China: Profile of Asylum Claims and Country Conditions ("2007 China Report"), concluded that neither petitioner established a well-founded fear of persecution.

For the reasons that follow, we grant the petition for review to the extent Chen and Li seek relief based on China's one-child policy and remand that claim for further consideration by the agency. We deny the petition for review to the extent it is grounded on the religious faith of the petitioners.

2

I.

A.

Li arrived in the United States in June 2001 without valid entry documents and was placed in removal proceedings by the Department of Homeland Security ("DHS"). Li sought political and religious asylum, but an immigration judge denied his application in 2003 and the Board affirmed in 2005. In 2010, however, the Board granted Li's motion to reopen.

Chen entered the United States in January 2003 on a nonimmigrant K-1 visa. A K-1 nonimmigrant visa, known colloquially as a "fiancé visa," permits the foreign-citizen fiancé of an American citizen to travel to the United States to marry his or her citizen sponsor within ninety days of arrival. See 8 U.S.C. § 1101(a)(15)(K)(i). Chen's fiancé sponsor, as it turned out, decided not to marry her. Chen, however, remained in the United States after the expiration of the ninety-day period. Chen and Li eventually met in 2005 and married in 2007.

Also in 2007, Chen gave birth to petitioners' two children—the first in January and the second in December. Chen did not have legal status in the United States, however, and she worried that if she were ever forced to return to China, she and Li would be considered violators of China's infamous one-child policy. Thus, in August 2007, while pregnant with petitioners' second child, Chen applied for political asylum, which led to

3

the DHS initiating removal proceedings against her for overstaying her visa. In 2011, the proceedings against Chen were consolidated with Li's reopened proceedings.

Chen and Li seek asylum on two identical grounds. First, Chen and Li claim that even though their children were born abroad, Chinese family planning officials would still consider the pregnancies to have been "out-of-plan" pregnancies and in violation of China's family-planning regulations. Chen and Li believe that they would face fines, imprisonment and involuntary sterilization upon their return to China. On this basis, they seek political asylum, which is potentially available for any person who establishes "a well founded fear that he or she will be forced to undergo [involuntary sterilization]" or will be "subject to persecution" for "other resistance to a coercive population control program." 8 U.S.C. § 1101(a)(42).

Li and Chen also seek religious asylum. As practicing Christians, Li and Chen claim that, if removed, they would be compelled by their beliefs to attend a "house church," which is illegal in China. They fear that participation in such a church would result in their arrest and detention and that they would be coerced by the government to renounce association with the church.

B.

1.

Although the IJ found both Li and Chen to be credible witnesses, he concluded that they failed to prove that their genuine fear of future persecution under the family-planning policy was objectively reasonable. The IJ's reasoning was two-fold. First, he determined that Li and Chen failed to prove they are in violation of China's family-planning policies. According to the 2007 China Report, upon which the IJ heavily relied, each married couple in the Fujian Province "is allowed to have one child without a birth permit." J.A. 419. A second child, therefore, is not allowed unless the government grants permission ahead of time by issuing a birth permit. But the IJ found that children born abroad are not counted against the number of children allowed unless the returning parents choose to register them as part of the household registration. The 2007 China Report states that

> U.S. officials in China are not aware of the alleged official policy, at the national or provincial levels, mandating the sterilization of one partner of couples that have given birth to two children, at least one of whom was born abroad.
>
> . . .
>
> . . . [T]he Population and Family Planning Commission of Fujian Province stated in an October 2006 letter that children born abroad, if not registered as permanent residents of China (i.e., not entered into the parents' household registration), are

5

not considered as permanent residents of China, and therefore are not counted against the number of children allowed under China's family planning law. . . .

J.A. 421-22.

Second, the IJ found that even if petitioners' children "counted" for purposes of China's family-planning law, Li and Chen would merely face fines or other economic penalties that do not rise to the level of persecution. Again, the IJ rested his factual determination on the 2007 China Report, which states that "[a]ccording to the Fujian Provincial Birth Planning Committee (FPBPC), there have been no cases of forced . . . sterilization in Fujian in the last 10 years." The Report, however, also acknowledges that "[i]t is impossible to confirm this claim" and cited reports of forced sterilizations in 2006. J.A. 418. The 2007 China Report notes that the FPBPC claims provincial officials impose only economic penalties—"social compensation fees"—upon violators, not physically coercive sanctions. J.A. 419. According to the 2007 China Report, however, for returning Chinese nationals who are the parents of U.S.-born children, even such economic penalties would be triggered only if the parents decided "to register their children as Chinese permanent residents in order to gain free . . . educational and other social benefits." J.A. 422.

The IJ noted some of the contradictory evidence submitted by Li and Chen, but indicated without explanation that the 2007 China Report was simply "more persuasive." The contradictory evidence from Chen and Li included (1) an affidavit (and supporting documents) from Renzun Yuan stating that immediately after removal to the Fujian Province, he was sterilized for having violated China's family-planning law even though his sons were born in the United States; (2) a 200-page scholarly critique of the 2007 China Report from Dr. Flora Sapio concluding that it was outdated, inaccurate or based on anecdotal or unverifiable evidence; (3) written certifications issued by the applicants' respective local family planning officials in Mei Hua Town, Chang Le City, and Ma Wei District of Fuzhou City indicating that Li and Chen would be sterilized upon returning to China under the circumstances; and (4) written affirmations from Chen's father and Li's mother stating that the certified statements from the family-planning officials were issued at their request. The IJ also dismissed written affirmations from two of the petitioners' cousins and two friends, all of whom attested to having undergone forcible sterilization after having unauthorized children in China. The IJ found such evidence lacking in probative value because the children were not born abroad.

Finally, as described in greater detail below, Li and Chen submitted evidence that the IJ either failed to mention or ignored altogether. This evidence included the 2009 Annual Report from the Congressional-Executive Commission on China ("2009 CECC Report"). The CECC Report states that, as of 2009, forced abortions and sterilizations were still occurring. While acknowledging that Chinese law prohibits official abuses relating to population control, the 2009 CECC Report notes that the law also requires local officials to carry out regular pregnancy tests on married women and administer unspecified "follow-up services" to the extent needed to meet planning goals. More specifically, local family-planning officials in the Fujian Province are authorized to take "remedial measures" for out-of-plan pregnancies, which the 2009 CECC Report interprets as a euphemism for compulsory abortions. Additionally, this report states that local authorities continued to require sterilization as a means of enforcing birth quotas.

The IJ also ignored or failed to mention evidence of a webpage maintained by the Fuzhou City (Fujian) Family Planning Committee which apparently provides a forum for citizens to submit questions about the family-planning policy and receive responses from the government. Li and Chen submitted a copy of a screenshot from this website, dated June 16, 2010, showing an

8

April 2008 inquiry from "Robert Lin" about the consequences faced by Chinese nationals who have out-of-plan children abroad and the Committee's response that "sterilization is mandatory" for violators of the one-child policy in this situation. J.A. 824.

2.

The BIA adopted and affirmed the IJ's decision that the petitioners did not meet their burden of proving that there is an "objectively reasonable possibility" that Li or Chen would be "forcibly sterilized, excessively fined, or otherwise persecuted for having two children without permission while in the United States." J.A. 4. The BIA offered additional reasons for discounting the evidence offered by Li and Chen. For example, the BIA observed that the certifications issued by family-planning officials in Mei Hua Town, Chang Le City, and the Ma Wei District of Fuzhou City, were entitled to little weight because they were unauthenticated, unsigned, did not identify the author, and were procured for litigation purposes.[1]

---

[1] The BIA also dismissed these certifications on the basis that the 2007 China Report indicates that village committees are "not authorized to make any decisions pertaining to family planning issues." According to the BIA, such documents should therefore "be deemed ineffective." JA 5. This conclusion badly misses the mark. The relevant question for asylum purposes is not what local authorities are <u>authorized</u> to do; the question, particularly given the pressure local authorities face to meet birth targets, is what they <u>actually</u> do. As discussed in
(Continued)

9

Likewise, the BIA found the statements from the petitioners' family and friends claiming to have suffered forcible sterilization to be unworthy of extended consideration because the statements contained unsworn assertions from typically biased witnesses and lacked sufficient detail to demonstrate that the witnesses were subject to persecution. And, like the IJ, the BIA was unpersuaded by the documents related to the case of Renzun Yuan because they were submitted to support an unrelated asylum applicant and the applicants offered no explanation as to how their attorney obtained the documents.

Relying exclusively on the 2007 China Report, the BIA concluded that there was no basis for believing that government officials in the Fujian Province use coercive measures rising to the level of persecution in circumstances such as these. The BIA acknowledged that "there undoubtedly have been instances of forced abortion and sterilization imposed on the parents of children conceived and born [out-of-plan] in China," J.A. 6, but the BIA distinguished the petitioners' claim on the basis that their children were born abroad in the United States. The BIA found that "[t]he evidence submitted in this case does not

greater detail below, petitioners' evidence highlights the importance of this distinction, demonstrating that local practice does not always correspond with national policy.

10

document any instance where enforcement measures rising to the level of persecution have been imposed on the parents of children who are United States citizens." Id. Finally, the BIA, relying on the 2007 China Report, restated the IJ's finding that the only scenario in which sanctions might be imposed for unauthorized overseas births would arise from the parents' registration of their children as members of their households upon returning to China in order to secure free public benefits. Even then, the BIA found, the parents would face only economic penalties.

The BIA did not mention the 2009 CECC Report or the Fuzhou City (Fujian) Family Planning Committee's response to Robert Lin on its webpage that sterilization is mandatory for violators of the one-child policy even when the out-of-plan children were born abroad.

## II.

Because the BIA "adopted and affirmed" the decision of the IJ but supplemented that decision with its own opinion, "the factual findings and reasoning contained in both decisions are subject to judicial review." Niang v. Gonzales, 492 F.3d 505, 511 n.8 (4th Cir. 2007). And, because the denial of asylum was based on the conclusion that Li and Chen failed to satisfy their burden of proving a well-founded fear of future persecution, we review these decisions under the "substantial evidence"

11

standard.  Dankam v. Gonzales, 495 F.3d 113, 119 (4th Cir.

2007).[2]  Under this deferential standard, "administrative

findings of fact are conclusive unless any reasonable

adjudicator would be compelled to conclude to the contrary."  8

U.S.C. § 1252(b)(4)(B).  In other words, we cannot disturb the

agency's "decision that an applicant is ineligible for asylum

unless we determine that the applicant's evidence 'was such that

a reasonable factfinder would have to conclude that the

requisite fear of persecution existed.'"  Djadjou v. Holder, 662

F.3d 265, 273 (4th Cir. 2011) (quoting INS v. Elias-Zacarias,

502 U.S. 478, 481 (1992)).

In order to establish eligibility for asylum under the

Immigration and Nationality Act ("INA"), an applicant must

_____

[2] The IJ also held that petitioners' asylum claim was time-barred because they filed their applications after the usual one-year deadline of arriving in the United States.  See 8 U.S.C. § 1158(a)(2)(B).  The BIA did not address this holding, and neither party briefed the issue on appeal.  To be brief but clear: the IJ's timeliness determination was wrong.  An application for asylum is still timely if, after the one-year deadline has passed, "changed circumstances [] materially affect the applicant's eligibility for asylum."  8 U.S.C. § 1158(a)(2)(D).  "Changed circumstances" include changed conditions in the applicant's country of nationality and "changes in the applicant's circumstances."  8 C.F.R. § 1208.4(a)(4)(1).  Chen filed her asylum application while pregnant with the couple's second child.  In light of China's family-planning policy, this second pregnancy plainly constitutes a change in the couple's circumstances that "materially affects" their eligibility for asylum.  See Qiu Yun Chen v. Holder, 715 F.3d 207, 208 (7th Cir. 2013) (concluding for same reason that an asylum application was timely).

12

demonstrate that he or she is entitled to refugee status.  See 8 U.S.C. § 1158(b)(1)(A).  Under the INA, a refugee is someone "who is unable or unwilling to return to . . . [his or her] country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A).  Petitioners "may satisfy this burden by showing either that they were subjected to past persecution or that they have a well-founded fear of future persecution on account of" one of the enumerated grounds.  Djadjou, 662 F.3d at 272 (internal quotation marks and alterations omitted).  The INA specifically permits victims of China's population control policy to seek political asylum:

> [A] person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.

8 U.S.C. § 1101(a)(42).

Li and Chen do not claim to have suffered past persecution, but seek asylum based on their fear of future persecution.  The "well-founded fear of persecution" standard set forth in § 1101(a)(42) has subjective and objective elements.  The

13

subjective component requires the alien to "present[] candid, credible, and sincere testimony demonstrating a genuine fear of persecution." Ngarurih v. Ashcroft, 371 F.3d 182, 187 (4th Cir. 2004) (internal quotation marks omitted). "The objective element requires a showing of specific, concrete facts that would lead a reasonable person in like circumstances to fear persecution." Id. at 187-88. Li and Chen's asylum claim faltered on the objective component. Although the IJ found both Chen and Li to be credible witnesses, he concluded that they did not prove their fear of future persecution was an objectively reasonable possibility.

### III.

Chen and Li contend that the IJ's decision, as supplemented by the BIA's order, lacked substantial evidence. In their view, the denial of asylum was unsupported by substantial evidence because the IJ and BIA relied almost exclusively on cherry-picked statements from the 2007 China Report and failed to consider compelling contradictory evidence suggesting that forced sterilizations are still a reality for Chinese nationals such as Chen and Li.

Typically, we have approved of the BIA's proclivity for finding State Department Country Reports to be the definitive word in asylum cases. After all, such reports are rightly considered to be "highly probative evidence in a well-founded

14

fear case.  Reliance upon these reports makes sense because this inquiry is directly within the expertise of the Department of State."  Gonahasa v. U.S. INS, 181 F.3d 538, 542 (4th Cir. 1999) (citations and internal quotation marks omitted).  In the context of substantial-evidence review, "[a]bsent powerful contradictory evidence, the existence of a State Department report supporting the BIA's judgment will generally suffice to uphold the Board's decision."  Id.

On the other hand, the BIA should avoid treating these Country Reports "as Holy Writ" immune to contradiction.  Galina v. INS, 213 F.3d 955, 959 (7th Cir. 2000) (Posner, C.J.). Although "our job as a reviewing court is not to reweigh the evidence," we must "ensure that unrebutted, legally significant evidence is not arbitrarily ignored by the factfinder" and that the agency does not "base [its] decision on only isolated snippets of [the] record while disregarding the rest."  Baharon v. Holder, 588 F.3d 228, 233 (4th Cir. 2009).  The BIA may not "selectively consider evidence, ignoring that evidence that corroborates an alien's claims and calls into question the conclusion the judge is attempting to reach."  Tang v. U.S. Att'y Gen., 578 F.3d 1270, 1280 (11th Cir. 2009) (internal quotation marks omitted).

In order for us to discharge "our responsibility to ensure that unrebutted, legally significant evidence is not arbitrarily

15

ignored by the factfinder," Baharon, 588 F.3d at 233, we require the IJ and the BIA to "offer a specific, cogent reason for rejecting evidence, whether testimonial or documentary, because it lacks credibility," Tassi v. Holder, 660 F.3d 710, 720 (4th Cir. 2011). We recognize that the BIA and IJ are not required to discuss every piece of evidence in the record, but they must "announce their decision[s] in terms sufficient to enable a reviewing court to perceive that they have heard and thought and not merely reacted." Ayala v. U.S. Att'y Gen., 605 F.3d 941, 948 (11th Cir. 2010) (internal quotation marks and alterations omitted); see Seck v. U.S. Att'y Gen., 663 F.3d 1356, 1368 (11th Cir. 2011).

We believe Chen and Li offered "powerful contradictory evidence," Gonahasa, 181 F.3d at 542, for which the BIA and the IJ failed to adequately account. As previously noted, Li and Chen submitted the 2009 CECC Report.[3] The BIA's failure to account for the reports of the CECC is not unprecedented. See, e.g., Qiu Yun Chen v. Holder, 715 F.3d 207, 209 (7th Cir. 2013) ("We note with disapproval that the Board without explanation

---

[3] Congress established the Congressional-Executive Commission on China in 2000 "as a bipartite body, consisting of federal legislators and executive-branch officials, whose purpose in part is to 'monitor the development of the rule of law in the People's Republic of China.'" Jiali Tang v. Synutra Int'l, Inc., 656 F.3d 242, 247 n.4 (4th Cir. 2011) (quoting 22 U.S.C. § 6912(c)).

16

systematically ignores the annual reports of the Congressional-Executive Commission on China, several of which we have cited, even though they are pertinent official publications of the federal government."); Ji Cheng Ni v. Holder, 715 F.3d 620, 627 (7th Cir. 2013) ("The Board's ongoing refusal to respond meaningfully to [CECC reports] is difficult to understand."); see also Zhu Ying Dong v. U.S. Atty. Gen., No. 12-13673, 2013 WL 6511992, at *1 (11th Cir. December 13, 2013). The 2009 CECC Report states that "[t]he use of [coerced abortions and sterilizations] in the enforcement of population planning policies remains commonplace despite provisions for the punishment of official abuse outlined in the PRC Population and Family Planning Law." J.A. 759. According to this report, population planning officials in the Fujian Province "are authorized to take 'remedial measures' to deal with 'out-of-plan' pregnancies"; "remedial measures" is "synonymous[] with compulsory abortion." Id. In 2008 and 2009, moreover, "[l]ocal authorities continue[d] to mandate surgical sterilization and the use of contraception as a means to enforce birth quotas." J.A. 215 (emphasis added).

The 2009 CECC Report appears to contradict the 2007 China Report upon which the IJ and BIA rely so heavily in concluding that compulsory sterilization for violators of the one-child policy is rare. Yet, neither the IJ nor the BIA explains why

17

the 2009 CECC Report, a more recent official government publication, is less persuasive than the 2007 China Report, nor was there any attempt to reconcile these reports. There may be a perfectly reasonable explanation for favoring one report over the other, or there may be a way to reconcile these seemingly contradictory documents. But the BIA has not revealed its reasoning, and we are not permitted to guess what the BIA or the IJ were thinking. See SEC v. Chenery Corp., 332 U.S. 194, 196 (1947) ("[A] reviewing court . . . must judge the propriety of [agency] action solely by the grounds invoked by the agency.").

Second, Li and Chen submitted a copy of a screenshot from a Fujian Province government webpage dated May 6, 2008, as evidence that Fujian family planning officials consider all couples who have multiple unauthorized births to be in violation of the one-child policy, even if such births occurred overseas. See www.fjjsw.gov.cn:8080/html/5/383/9626_200856322.html. This evidence suggests that the Fujian Province "Population and Procreation Planning Committee" provided a forum for citizens to submit questions and receive responses about the family planning policy. J.A. 824. In response to a query about the consequences a returning Fuzhou couple would face after having two children in the United States, the committee indicated that they were in violation of provincial family planning regulations and that "sterilization is mandatory." J.A. 825. This evidence

18

is significant in that it purports to come directly from the same Fujian "Population and Procreation Planning Committee" that is referenced in the 2007 China Report, but it upends the BIA's conclusion that there is no danger of sterilization where the would-be violator's children were born abroad. See Qiu Yun Chen, 715 F.3d at 212 (explaining that the same Fujian webpage "cuts the ground out from under what the Board called the 'key aspect of this case'—that because [petitioner's] children were born abroad, she is in no danger of being forced to undergo sterilization"). To be sure, this document may not expressly contradict the BIA's finding that "the evidence submitted in this case does not document any instance where enforcement measures rising to the level of persecution have [already] been imposed on the parents of children who are United States citizens." But it certainly portends forced sterilization of the inquiring couple and suggests that other parents of U.S.-born children have faced similar persecution.[4]

---

[4] Moreover, the affidavit of Renzun Yuan does flatly contradict the BIA's characterization of the record evidence, as it documents an instance of forced sterilization of the father of U.S.-born children. We also note that the BIA has used this precise language before when relying on the 2007 China Report to reject an asylum application from a similarly situated applicant on the grounds that the record "does not document any instance where enforcement measures rising to the level of persecution have been imposed on the parents of children who are United States citizens." Li Ying Zheng v. Holder, 722 F.3d 986, 989 (7th Cir. 2013) (internal quotation marks omitted).

19

In our opinion, the foregoing contradictory evidence is strong enough that it requires the agency to account for it in a meaningful way. The boilerplate language used by the BIA in discounting Li and Chen's evidence was insufficient to demonstrate that the agency gave it more than perfunctory consideration. Presented with a record containing virtually identical contradictory documentary evidence, the Seventh Circuit has on more than one occasion rejected the BIA's exclusive reliance on the 2007 China Report and remanded for the BIA to offer an explanation that accounts for such evidence. See Li Ying Zheng, 722 F.3d at 991; Qiu Yun Chen, 715 F.3d at 214; Ji Cheng Ni, 715 F.3d at 630-31; see also Zhu Ying Dong v. U.S. Atty. Gen., 2013 WL 6511992, at *1. We agree with the thrust of these decisions that petitioners are "entitled to have the expert agency, the BIA, evaluate in a transparent way the evidence that [they have] presented" and that "[s]imply stating that a 2007 document defeats a claim . . . will not do." Ji Cheng Ni, 715 F.3d at 631.

IV.

Chen and Li also seek asylum and withholding of removal based on their Christian faith. Again, both Li and Chen were found to be credible witnesses. Their task, therefore, was to establish that their genuine subjective fear of persecution based on their religious faith is objectively reasonable, i.e.,

20

that "[t]here is a reasonable possibility of suffering such persecution," 8 C.F.R. § 1208.13(b)(2)(B), and that "a reasonable person in like circumstances" would fear religious persecution. Ngarurih, 371 F.3d at 187-88.

Chen testified that when she met Li in 2005, he indicated he was a practicing Christian and he invited her to attend church services with him. Chen did not convert to Christianity, however, until 2009 after talking to her neighbors in Greensboro, North Carolina. Chen was baptized in 2010 and began regularly attending a Chinese Christian Church in Greensboro with Li and their children. Chen testified that if she is removed to China, she would be compelled by her beliefs to attend an unsanctioned "underground" or "house" church rather than an "official registered church" that "preach[es] about the . . . government's policies." J.A. 139, 140. Chen fears that her participation in such a church would be discovered by the government, subjecting her to arrest, torture, and fines. She also fears that the government would force her to renounce her participation in any unsanctioned church. Chen's fear is based to a great extent on the experience of her mother, who Chen testified was persecuted based on her church affiliation in 2009. According to Chen, her mother was one of eight members of an underground church to be arrested. Chen testified that her mother was detained for six days, during which time she was

21

slapped in the face and forced to sign a written guarantee that she would cease participating in her church. Chen indicated the government also imposed on her mother a significant fine of 2,500 renminbi (RMB).

Li testified that he was a practicing Christian before he left China and attended an unsanctioned house church in the Fujian Province. Li testified that in March 2001, officials from the Public Security Bureau came to his home to arrest him for participating in the church but that he was able to elude arrest. Li left China shortly thereafter and arrived in the United States in June 2001. He testified that he subsequently learned from his sister that authorities looked for him after the 2001 incident, but that he did not have any information suggesting that they have looked for him recently. Li was baptized in September 2001 after arriving in the United States, and he verified that he attends church with Chen and their children.

Like Chen, Li indicated that his fear of being persecuted on account of his religion was made real because of what he and Chen were told happened to his mother-in-law in 2009 as a result of her affiliation with an unsanctioned church. And, like Chen, Li stated that if he returns to China, he will attend an unsanctioned house church, for which he believes he will suffer official retribution including arrest and torture.

Li and Chen also called their pastor, Steven Chang, to testify at the hearing. Chang confirmed that he is the pastor of a non-denominational Chinese Christian church in Greensboro and that, as of the date of the asylum hearing, Chen and Li had been attending the church for approximately one year. Chang indicated that he was generally familiar with the plight of Christian house churches because Chang had visited in China with missionaries financially supported by his church. Based on his experience, Chang indicated that government interference and harassment of unsanctioned congregations tended to increase proportionally with the visibility of the congregation. Thus, a house church with fifty congregants or fewer might conduct its services relatively unimpeded by the government, especially if it operated in a large metropolitan area. In less populated areas, Chang observed, it is more difficult to congregate without attracting attention. Chang noted additionally that the zealousness with which government officials police unsanctioned religious activities varies by location. Chang indicated he had never been to Chen and Li's native Fujian Province, and he did not offer observations specifically regarding the treatment of Christians who attend unsanctioned churches there.

The IJ found that the applicants failed to establish that their fear of future persecution on account of their Christian faith was objectively reasonable. Relying on background

23

materials published by the State Department, the IJ found that "while participation in unsanctioned Christian churches, such as house churches, is not approved by the Chinese government, those that do participate are not generally persecuted." J.A. 83. The IJ noted that according to the 2007 China Report, house churches, though not officially approved, are "quietly tolerated" as long as they remain "small and unobtrusive." J.A. 83. Citing estimates from the State Department's 2010 International Religious Freedom Report, the IJ observed there are as many as 50-70 million Christians in China who practice their faith in connection with unsanctioned house churches. Additionally, the IJ was unconvinced that the treatment suffered by Chen's mother reflected widespread persecution of house church congregants in Chen's home town because, according to the IJ, Chen's mother continued to attend a house church after her arrest and experienced no further trouble.

Relying on the same background materials reporting on religious freedoms in China, the BIA affirmed the IJ's finding that Li and Chen failed to establish a reasonable possibility that they would be persecuted because of their Christian faith. The BIA noted that the record did not support the IJ's statement that Chen's mother had continued to attend a house church in China, but it concluded that this error "[did] not undercut the [IJ]'s reasoned conclusion that the respondents do not have an

24

objectively reasonable fear of persecution in China based on their religion." J.A. 7.

Chen and Li argue that they established an objectively reasonable fear of religious persecution through both the general background materials published by the State Department and specific evidence that they will risk persecution by attending home churches in their respective home towns in the Fujian Province. Because the BIA denied asylum based on the conclusion that Chen and Li failed to carry their evidentiary burden, we must not only conclude that the evidence presented sufficed to prove an objectively reasonable fear of religious persecution, but also that the "evidence presented was so compelling that no reasonable factfinder could fail to find" that a reasonable possibility of such persecution existed. Dankam, 495 F.3d at 119 (emphasis added) (internal quotation marks omitted).

While Chen and Li presented some contrary evidence, that evidence is not so compelling that we cannot defer to the agency's factual determinations. First, we disagree with Chen and Li that the State Department's 2010 International Religious Freedom Report and 2007 China Report support their claim for religious asylum. Although these materials certainly reported isolated cases of official harassment, the general picture presented by both reports was simply that official treatment of

Christians who attend unregistered house churches varies substantially based on locale and that such Christians in many regions practice their religion without interference. As noted by both the IJ and the BIA, Steve Chang, the applicants' pastor who testified on their behalf at the asylum hearing, agreed with the general assessment that house churches are able to operate undisturbed in many areas of China. Moreover, Chen and Li have not directed us to any portion of these reports suggesting widespread persecution of Christians attending house churches in the Fujian Province.

There was scant evidence presented specifically showing the persecution of Christians attending house churches in the Fujian Province. Primarily, this included the testimony of the petitioners themselves regarding the arrest and abuse of Chen's mother, as well as her mother's written statement regarding the incident. Chen's mother, however, attended a house church in Chen's hometown of Mei Dong Village in the Mei Hua Town area of Chang Le City; Chen testified that if she and Li are removed, they will live in and attend a house church in Li's hometown of Shangdao Village of the Mawei District of Fuzhou City. Li testified that officials unsuccessfully attempted to arrest him in 2001 for attending a house church while he still lived in China. Li provided no testimony indicating that house church congregants in the Mawei District were persecuted regularly or

26

even intermittently, and he conceded that he had no reason to believe that government officials were still looking for him.

In sum, viewing the record as a whole, we cannot say that the evidence compels us to conclude that there is a reasonable possibility that either Chen or Li will suffer persecution on account of their religious faith if they return to China. Thus, we cannot disturb the BIA's conclusion that Li and Chen failed to establish a well-founded fear of future persecution. Consequently, Chen and Li are not entitled to relief on the BIA's denial of religious asylum.

On a final note, having found substantial evidence supports the agency's denial of religious asylum, we necessarily uphold the denial of Chen and Li's application for withholding of removal on account of their religious faith. See 8 U.S.C. § 1231(b)(3). "Because the burden of proof for withholding of removal is higher than for asylum—even though the facts that must be proved are the same—an applicant who is ineligible for asylum is necessarily ineligible for withholding of removal under § 1231(b)(3)." Camara v. Ashcroft, 378 F.3d 361, 367 (4th Cir. 2004).

## V.

For the foregoing reasons, we grant the petition for review as it relates to the BIA's denial of asylum and withholding of removal based on the petitioners' fear of being subjected to

involuntary sterilization under China's one-child policy, and we remand that particular claim for the agency to reevaluate it in accordance with this opinion. In conducting its analysis on remand, the BIA should account for, at a minimum, (1) the 2009 CECC Report, (2) the evidence relating to the "Robert Lin" inquiry on the website of the Fujian Province Population and Planning Committee, and (3) the affidavit of Renzun Yuan. We deny the petition for review, however, as it relates to the BIA's denial of relief based on petitioners' claim that they will be persecuted on account of their Christian faith if they return to China.

PETITION FOR REVIEW GRANTED IN PART AND DENIED IN PART