UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 15-1408

CISSY SEGUJJA MAZZI,

　　　　　　Petitioner,

　　　v.

LORETTA E. LYNCH, Attorney General,

　　　　　　Respondent.

On Petition for Review of an Order of the Board of Immigration
Appeals.

Argued:　October 26, 2016　　　　Decided:　December 1, 2016

Before GREGORY, Chief Judge, WYNN, Circuit Judge, and DAVIS, Senior
Circuit Judge.

Petition for review granted in part and case remanded by
unpublished opinion.　Senior Judge Davis wrote the opinion, in
which Chief Judge Gregory and Judge Wynn joined.

**ARGUED:** Lori Beth Schoenberg, LAW OFFICES OF LORI B. SCHOENBERG,
Los Angeles, California, for Petitioner.　Lance Lomond Jolley,
UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for
Respondent.　**ON BRIEF:** Benjamin C. Mizer, Principal Deputy
Assistant Attorney General, Civil Division, Jesse M. Bless, Senior
Litigation Counsel, Office of Immigration Litigation, UNITED
STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

Unpublished opinions are not binding precedent in this circuit.

DAVIS, Senior Circuit Judge:

Cissy Segujja Mazzi ("Mazzi"), a native and citizen of Uganda, petitions for review of the final order of the Board of Immigration Appeals ("BIA") regarding her asylum and withholding of removal claims. For the reasons that follow, we grant in part Mazzi's petition and remand the case to the BIA for further proceedings.

I.

Mazzi is a native and citizen of Uganda. When Mazzi was eleven years old, she moved with her family to a village in Bukwo, a district in eastern Uganda, where her maternal grandparents lived. Mazzi's mother and maternal grandparents belonged to the Sabiny tribe, an ethnic group that practiced female genital mutilation ("FGM").[1] Mazzi's mother passed away in 1990, the year

---

[1] We provide the following description of the underlying act:

> Female genital mutilation, commonly called FGM, is the designation generally given to a class of surgical procedures involving the removal of some or all of the external genitalia, performed primarily on girls and young women in Africa and Asia. Often performed under unsanitary conditions with highly rudimentary instruments, FGM is extremely painful, permanently disfigures the female genitalia, [and] exposes the girl or woman to the risk of serious, potentially life-threatening complications, including bleeding, infection, urine retention, stress, shock, psychological trauma, and damage to the urethra and anus. FGM can result in the permanent loss of genital sensation in the victim and can adversely affect sexual function.

Haoua v. Gonzales, 472 F.3d 227, 230 n.5 (4th Cir. 2007) (alteration in original) (internal quotation marks and citations

that Mazzi's sister turned sixteen. Some months later, Mazzi's grandmother arranged for her sister to undergo FGM so she could marry a village elder. Fearing she would be next to forcibly undergo FGM, Mazzi began to save money to purchase a bus ticket to Kampala, where her father lived.

When Mazzi was fifteen years old, she was taken by her sister to the village elders to undergo circumcision. Mazzi was able to escape with the assistance of a friend, who gave her enough money to purchase a bus ticket to Kampala. When she found her father, he allowed her to live with him and his new family. Her father's tribe, the Baganda, did not practice FGM, and none of her half-siblings living with her father were forced to undergo the procedure. Mazzi enrolled in a nearby secondary school and was later admitted to Makerere University.

During her orientation at Makerere University, Mazzi encountered a girl from her Bukwo village, Lumonya, who recognized Mazzi. Upon returning from class one day, Mazzi found her sister and her brother-in-law waiting for her in her dorm room. Lumonya had informed her mother where Mazzi lived, and Mazzi's sister used

---

omitted). FGM has also been described as genital circumcision or cutting. See Gomis v. Holder, 571 F.3d 353, 355 (4th Cir. 2009); Kourouma v. Holder, 588 F.3d 234, 242 (4th Cir. 2009). We have long recognized that FGM constitutes persecution within the meaning of the Immigration and Nationality Act. Haoura, 472 F.3d at 231-32 (citations omitted).

this information to find Mazzi. Although the visit was short, Mazzi's sister promised to come back and visit soon. Mazzi believed it was no longer safe to live in the campus dorms, and she moved off-campus and commuted during her four years at the university. Believing that her village elders were afraid of challenging her father, Mazzi rented a two-room house close to her father's home.

In 2003, Mazzi obtained a job at Kyambogo University. After Mazzi's father promised to check up on her, Mazzi moved to a new house closer to her work. Three months later, Mazzi learned that her neighbor recognized her as a Sabiny woman who had escaped circumcision. This neighbor threatened to reveal Mazzi's identity and location to Sabiny elders, and she extorted goods and services from Mazzi in exchange for her silence. In 2004, Mazzi moved in the middle of the night to escape this neighbor. After she fled, Mazzi kept to herself and did not talk to others. However, six months later, she boarded a taxi whose conductor was a man from her Bukwo village. The conductor told the taxi driver that Mazzi was the girl from the Sentambule family, her brother-in-law's family, who had escaped FGM. Mazzi left the taxi at the next stop; thereafter, she avoided public transportation. Mazzi testified that she could not travel freely in Uganda due to fear she would be recognized and turned over to the Sabiny or her sister's family. She also explained that FGM was considered a rite of passage for

4

girls in the Sabiny tribe, and uncircumcised girls and women were often blamed for any misfortunes that befell their families. Mazzi's sister suffers from chronic back pain and an inability to conceive, and these misfortunes are blamed on Mazzi's refusal to undergo the knife. Mazzi testified that her brother and her friend, John Cabonga, told her over the phone that she will be forcibly cut if she returns to Uganda.

In September 2003, Mazzi entered the United States before returning to Uganda after a few weeks. On or about August 28, 2005, Mazzi entered the United States on a valid student visa. She later sought to adjust her status to a legal permanent resident based on her marriage to a U.S. citizen, but her application was denied due to a finding of fraud. Mazzi subsequently fell out of status. On August 18, 2008, the Department of Homeland Security served Mazzi with a Notice to Appear ("NTA"). The NTA charged Mazzi with removability under § 237(a)(1)(B) of the Immigration and Nationality Act as someone who remained beyond the period authorized by her visa. Mazzi admitted she was removable as charged, but she requested time to apply for adjustment of status. Mazzi filed an I-360 Petition as a self-petitioning spouse of an abusive U.S. citizen, which was denied for insufficient evidence. Mazzi then sought a continuance to apply for adjustment of status in light of her second marriage. The IJ denied this request given the earlier finding of fraud, which would prohibit any future

5

adjustment applications on the basis of marriage.  Subsequently, Mazzi applied for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").  This application was filed, at the earliest, on February 25, 2013.  In 2010, before the filing of this application, Mazzi's father passed away.

Mazzi submitted country reports and articles in support of her claims for relief.  Her reports explained the significance of FGM within Sabiny culture, and one report indicated that the practice of FGM was estimated at approximately 50% among the Sabiny.  Other reports indicated that after the Ugandan government prohibited genital cutting in 2010, the Sabiny have continued — and may have increased — their practice of FGM.  Mazzi also provided testimony of her experiences in Uganda, including her encounters with members of the Sabiny community, her sister, and her brother-in-law while living 300 miles away from her Bukwo village.  Given her father's passing in 2010, Mazzi believes there is now no one in Uganda who can protect her from the Sabiny tribe if she were forced to return.

Following a hearing, the Immigration Judge ("IJ") denied all requested relief.  The IJ first determined that Mazzi's application for asylum was time-barred under 8 U.S.C. § 1158(a)(2)(B).  Turning to the merits, the IJ ruled that Mazzi's claimed fear of future persecution was not objectively reasonable.  The IJ found this claimed fear was inconsistent with evidence proffered by both Mazzi

6

and the Government, which demonstrated that only 1% of the female population in Uganda is subjected to FGM, the practice of FGM is targeted at unmarried girls under the age of 18, and FGM is now prohibited by the Ugandan government. At the time of the hearing, Mazzi was 37 years old. The IJ further opined that Mazzi's own experiences in Uganda undermined the objective reasonableness of her fear of future persecution. The IJ noted that Mazzi was never kidnapped or taken for the procedure after she fled her Bukwo village, and the IJ concluded that Mazzi can avoid persecution by relocating to a different part of the country. Thus, having determined that Mazzi's claimed fear of persecution was not objectively credible, the IJ denied Mazzi's requests for asylum and withholding of removal. Then, finding that Mazzi failed to demonstrate a clear probability of torture at the instigation of or with the consent or acquiescence of a public official, the IJ also denied Mazzi's request for protection under CAT.

The BIA dismissed Mazzi's appeal in a two-page opinion. At the outset, the BIA found Mazzi's claim of ineffective assistance of counsel to be unsupported by documentation. Turning to the IJ's denial of relief, the BIA provided two grounds for dismissing Mazzi's remaining claims. First, the BIA stated that Mazzi "ha[d] not meaningfully challenged the Immigration Judge's decision, or its underlying reasoning, as it pertains to the timeliness of her application, the credibility of her claim, or the basis of her

7

fear." J.A. 3. "In any event," however, the BIA provided a second ground for dismissal: it "f[ound] no clear error in the Immigration Judge's findings of fact and otherwise adopt[ed] and affirm[ed] h[er] decision" to deny Mazzi's requests for relief. Id.

Mazzi timely filed a petition for review as to her asylum and withholding of removal claims,[2] and we possess jurisdiction pursuant to 8 U.S.C. § 1252.

II.

Where, as here, the BIA adopts and supplements an IJ decision, we review both decisions. Cordova v. Holder, 759 F.3d 332, 337 (4th Cir. 2014) (citing Ai Hua Chen v. Holder, 742 F.3d 171, 177 (4th Cir. 2014)). We must uphold the BIA's determinations unless they are "manifestly contrary to the law and an abuse of discretion." Tassi v. Holder, 660 F.3d 710, 719 (4th Cir. 2011). Legal conclusions are reviewed de novo. Cordova, 759 F.3d at 337. We review the agency's credibility and factual findings for substantial evidence, and we are obligated to treat them as conclusive "unless any reasonable adjudicator would be compelled

---

[2] Because Mazzi did not raise any arguments regarding the dismissal of her CAT claim, she has waived any issues regarding this form of relief. See Karimi v. Holder, 715 F.3d 561, 565 n.2 (4th Cir. 2013). In a mere footnote, the Government argues that Mazzi also waived her withholding of removal claim by failing to address this issue in her opening brief. This contention is unavailing. Throughout her opening brief, Mazzi repeatedly argues that the IJ and BIA erred when denying both her claims for asylum and withholding of removal.

to conclude to the contrary." Id. (quoting Chen, 742 F.3d at 178).
However, the agency abuses its discretion where it "fail[s] to
offer a reasoned explanation for its decision, or if it distort[s]
or disregard[s] important aspects of the applicant's claim."
Tassi, 660 F.3d at 719 (citing Jian Tao Lin v. Holder, 611 F.3d
228, 235 (4th Cir. 2010)).  In reviewing the agency's decisions,
it is "our responsibility to ensure that unrebutted, legally
significant evidence is not arbitrarily ignored by the
factfinder."  Baharon v. Holder, 588 F.3d 228, 233 (4th Cir. 2009)
(citation omitted).

### A.

Mazzi first contends that the BIA erred when it summarily
concluded that Mazzi "ha[d] not meaningfully challenged the [IJ]'s
decision, or its underlying reasoning, as it pertains to the
timeliness of her application, the credibility of her claim, or
the basis for her fear."  Pet'r's Br. 34 (quoting J.A. 3).  Mazzi
argues that this failure warrants a remand for further explanation.

The Supreme Court has instructed that "the process of review
requires that the grounds upon which the administrative agency
acted be clearly disclosed and adequately sustained."  SEC v.
Chenery Corp., 318 U.S. 80, 94 (1943).  We "cannot review the BIA's
decision [when] the BIA has given us nothing to review."  Nken v.
Holder, 585 F.3d 818, 822 (4th Cir. 2009) (alteration in original)
(quoting Li Fang Lin v. Mukasey, 517 F.3d 685, 693-94 (4th Cir.

9

2008)). Where, as we conclude occurred here, "a BIA order does not demonstrate that the agency has considered an issue, 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" Id. (quoting INS v. Ventura, 537 U.S. 12, 16 (2002) (per curiam)). In its order, the BIA did not define what constitutes a "meaningful challenge" to an order of removal, nor did it explain why Mazzi's challenges were deemed inadequate. Moreover, from this conclusory assertion, it is impossible to identify which specific challenges, if any, were considered by the BIA when it found Mazzi's appeal lacking. Well-established precedent dictates that a court must "restrict itself to what the agency actually did say" rather than "guess[ing] at what the agency meant to say," id., and the BIA's "cursory statement . . . does not provide us enough information to conduct a meaningful review of the BIA's conclusion," Fang Lin, 517 F.3d at 693.

If this were the only ground for the BIA's denial order, "the proper course . . . [would be] to remand to the agency for additional investigation or explanation." Cordova, 759 F.3d at 338 (citation omitted). However, the BIA provided an alternative basis for its decision: it reached the merits of the IJ's decision and found no clear error in her findings. J.A. 3. No remand is necessary if the BIA correctly found no clear error in the IJ's

10

findings and denial order.  Accordingly, we turn to Mazzi's arguments challenging the IJ's denial of relief.

B.

Mazzi argues that the IJ's findings were not supported by substantial evidence.  In assessing this contention, we must note an important distinction between Mazzi's claims for asylum and withholding of removal.  An individual applying for asylum must show "by clear and convincing evidence that the application has been filed within one year after the date of [her] arrival in the United States."  8 U.S.C. § 1158(a)(2)(B).  Withholding of removal, on the other hand, is not subject to the one-year limitation bar.  Accordingly, given that Mazzi filed her application for asylum years after she entered the United States in 2005, she may pursue asylum only if she "qualifies for an exception to the one-year deadline."  8 C.F.R. § 1208.4(a)(2)(i)(B).

The IJ rejected Mazzi's contentions that she could identify changed or extraordinary circumstances under 8 U.S.C. § 1158(a)(2)(D) that would excuse her untimely filing.  The IJ determined that Mazzi's "asylum application is late by any analysis," and she concluded Mazzi is thereby "barred from asylum." J.A. 101.  The BIA found no clear error in any of the IJ's determinations, and it adopted and affirmed her denial of asylum. Absent a colorable constitutional claim or question of law, "we lack jurisdiction to review the [IJ]'s discretionary

11

determination, as affirmed by the BIA, that [Mazzi] had not demonstrated changed or extraordinary circumstances to excuse her untimely filing." Gomis v. Holder, 571 F.3d 353, 359 (4th Cir. 2009). Mazzi contends that the BIA's "refusal" to review the IJ's assessment of her asylum claim was "prejudicial," given this Court's inability to consider "questions concerning the timeliness of [her] asylum application." Pet'r's Br. 38. In making this assertion, however, Mazzi mischaracterizes the BIA's order; the BIA reached the findings of fact articulated in the IJ's decision and expressly adopted the IJ's reasoning. Mazzi then challenges the conclusory nature with which the BIA affirmed and adopted the IJ's order, arguing that the BIA "effectively insulated" the IJ's determinations from review. Id. at 39. This argument is without merit. In Gomis, despite the BIA's conclusory assertion that there was "no error in the [IJ]'s decision" regarding timeliness, we held we lacked jurisdiction to review the IJ's determination. Gomis, 571 F.3d at 358–59.

Here, too, we are without jurisdiction to review the timeliness basis for the denial of Mazzi's application for asylum. Accordingly, we need not reach Mazzi's remaining arguments regarding her eligibility for asylum, and her Petition for Review is denied as it relates to her asylum claim.

C.

We now turn to Mazzi's withholding of removal claim. To qualify for withholding of removal, an applicant must show a clear probability that her life or freedom would be threatened in the country of removal because of her "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. § 208.16(b)(2). Withholding of removal is mandatory if the applicant satisfies her burden of proof. Gomis, 571 F.3d at 359 (citation omitted). Whereas an applicant must prove her "removal would create a 'reasonable possibility' — as low as a ten percent chance — of persecution" for asylum purposes, Crespin-Valladares v. Holder, 632 F.3d 117, 126 (4th Cir. 2011) (citing INS v. Cardoza-Fonseca, 480 U.S. 421, 431 (1987)), an applicant must prove it is more likely than not she will suffer persecution to qualify for withholding of removal, Gomis, 571 F.3d at 359.

Here, Mazzi asserts she is a member of a particular social group: women in the Sabiny tribal group in Uganda that, due to their gender and kinship ties, are subjected to the practice of FGM. The IJ found that Mazzi's fear of persecution was not objectively reasonable, and it found her testimony to be not credible exclusively on this basis. Mazzi argues that the IJ and BIA erred by relying exclusively on general country conditions and failing to consider compelling, contradictory evidence specific to

13

Mazzi's individual experiences. We find that this failure warrants remand for further explanation.

Although our task as the "reviewing court is not to reweigh the evidence," we must nonetheless "ensure that unrebutted, legally significant evidence is not arbitrarily ignored by the factfinder." Chen, 742 F.3d at 179 (quoting Baharon, 588 F.3d at 233). The agency may not "base [its] decision on only isolated snippets of [the] record while disregarding the rest," Baharon, 588 F.3d at 233, and the agency may not "selectively consider evidence, ignoring that evidence that corroborates an alien's claims and calls into question the conclusion the judge is attempting to reach," Chen, 742 F.3d at 179 (quoting Tang v. U.S. Att'y Gen., 578 F.3d 1270, 1280 (11th Cir. 2009)). Here, Mazzi offered numerous pieces of compelling evidence, including, most tellingly, evidence specific to her individual experiences, for which the BIA and IJ failed to adequately account.

First, the IJ failed to analyze Mazzi's proposed social group without explanation. Failure to analyze an immigrant's proposed social group is an abuse of discretion requiring remand. See Cordova, 759 F.3d at 338 (4th Cir. 2014). Mazzi testified that she is considered Sabiny due to her kinship and family ties, and thus her proposed social group was Sabiny women who had not yet been subjected to FGM. Yet the IJ asserted that Mazzi's protected ground was as a "wom[an] fearing FGM," and she subsequently

14

analyzed Mazzi's claim in light of general statistics regarding a different proposed social group: Ugandan women fearing FGM. J.A. 101, 103. The IJ either failed to analyze Mazzi's proposed social group completely, or the IJ disregarded Mazzi's proposed social group and failed to account for Mazzi's compelling evidence that she is a Sabiny woman subject to the practice of FGM. The IJ may have had reason to disregard Mazzi's proposed social group or her testimony about her Sabiny ties, but the IJ failed to address either element in her analysis.

Second, the IJ relied heavily on the evidence that only 1% of all Ugandan girls and women are subjected to FGM. However, at least one article submitted by Mazzi indicates that approximately 50% of Sabiny girls and women undergo FGM. J.A. 277. Evidence that Mazzi, as a Sabiny woman, faces a higher risk of FGM than others outside her specific ethnic group is not inconsistent with country reports documenting a low rate of FGM across all ethnic groups. Yet the IJ did not account for this higher, relevant risk in her analysis of the evidence, nor did she explain why she dismissed this evidence in favor of general statistics. Base rates matter.

Third, although the IJ emphasizes that the Ugandan government has prohibited the use of FGM, reports also acknowledge that the Sabiny have continued to practice FGM despite this ban. J.A. 310-11. Indeed, at least one report acknowledged an increase in the

15

prevalence of FGM among Sabiny communities arising from defiance to the new law. J.A. 282, 286. The IJ did not discuss or acknowledge this defiance to, if not failure of, enforcement and instead, relied only on evidence that FGM was outlawed in Uganda.

Fourth, the IJ emphasized that "not one single article" indicates a previously married woman, or a woman over the age of 18, has been subjected to FGM in Uganda. J.A. 102. According to the IJ, Mazzi's age and marital status likely save her from circumcision. However, at least one article submitted by Mazzi states: as it has "often [been] reported, married women who had avoided FGM as girls are swelling the ranks of those being cut in Kapchorwa today[.]" J.A. 273 (emphasis added). Moreover, Mazzi testified that uncircumcised women continue to be blamed for the misfortunes of their family, no matter their age or marital status. Mazzi's sister suffers from chronic back pain and an inability to conceive, which she blames on Mazzi's refusal to undergo the knife. An article submitted by Mazzi corroborates her testimony that "uncircumcised women were seen by the Sabiny as the source of disasters — including food shortages in the community and infertility in the household." J.A. 273. According to Mazzi's testimony, multiple individuals have informed her that, due to this cultural belief, she will be forcibly cut if she returns to Uganda. Although these reasons for enforcing circumcision on Mazzi appear pressing and relevant despite her age and marital status,

16

the above evidence was not identified or discussed in the IJ's analysis regarding Mazzi's objective fear or credibility.

Fifth, the IJ made two observations regarding Mazzi's individual experiences in Uganda: she noted it was "interesting" that Mazzi lived with her mother's Sabiny family until she was fifteen years old and was never taken for FGM during this time, and she noted that when Mazzi moved away from her mother's family, "[n]o one came after her and stole her into this ritual." J.A. 104. However salient they may be, these assertions comprise an incomplete narrative insofar as they fail to acknowledge other compelling aspects of Mazzi's testimony. That is, Mazzi was able to escape circumcision when living with her mother's family precisely because she <u>fled her home</u> at the moment she was taken for FGM. Moreover, even when Mazzi lived 300 miles away from her Sabiny community, she was identified on at least three separate occasions as the girl who had escaped circumcision from her village. On one occasion, she was extorted with threats of revealing her identity and location to Sabiny elders. On another occasion, her sister and brother-in-law <u>successfully tracked down Mazzi's location</u> and visited her with promises to return, despite her distance from her home village. The threat of persecution is especially troubling now that her father, the only person Mazzi believed could protect her from her Sabiny family and elders, has since passed away. Mazzi's testimony that she continued to be

17

recognized and threatened by the Sabiny community, even when living 300 miles away from her Bukwo village, further call into question the thoroughness of the IJ's conclusion that Mazzi could "reasonably relocate within the country of Uganda to avoid any persecution." J.A. 105.

We have determined that country conditions reports should not be viewed "'as Holy Writ' immune to contradiction," and Mazzi is "entitled to have the expert agency, the BIA, evaluate in a transparent way the evidence that [she has] presented." Chen, 742 F.3d at 179, 181 (citations omitted). The evidence identified above significantly rebuts or challenges the IJ's reasoning regarding an objective likelihood of persecution and credibility as it relates to Mazzi's specific circumstances, and we believe it is "strong enough that it requires the agency to account for it in a meaningful way." Id. at 181. We are persuaded that the IJ and BIA failed to adequately "offer a specific, cogent reason for rejecting [the significant] evidence" identified above in favor of general statistics, Tassi, 660 F.3d at 720, and they failed to "announce their decision[s] in terms sufficient to enable a reviewing court to perceive that they have heard and thought and not merely reacted," Chen, 742 F.3d at 179 (quoting Ayala v. U.S. Att'y Gen., 605 F.3d 941, 948 (11th Cir. 2010)). We are restricted by this silence; even if the IJ or BIA had sound reasons for favoring general statistics over Mazzi's situation-specific

18

evidence, we are not permitted to "guess at what an agency <u>meant</u> to say." <u>Nken</u>, 585 F.3d at 822 (emphasis added). To the extent boilerplate language was used to discount any of the above evidence, it was plainly "insufficient to demonstrate that the agency gave it more than perfunctory consideration." <u>Chen</u>, 742 F.3d at 181.

We take seriously "our responsibility to ensure that unrebutted, legally significant evidence is not arbitrarily ignored by the factfinder." <u>Baharon</u>, 588 F.3d at 233 (citation omitted). Thus, given the deficiencies identified above, we remand this case for further explanation. <u>See</u> <u>Chen</u>, 742 F.3d at 179-81 (remanding where the BIA and IJ failed to adequately account for petitioners' "powerful contradictory evidence"); <u>Nken</u>, 585 F.3d at 822 (remanding where the BIA failed to explain why a strong piece of evidence provided insufficient justification for reopening the proceedings).

III.

For the foregoing reasons, we grant the Petition for Review as it relates to the denial of withholding of removal, and we remand for the agency to reevaluate it in accordance with this opinion.

<u>PETITION FOR REVIEW</u><br><u>GRANTED IN PART AND CASE REMANDED</u>

19