**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 19-1591

HERNAN PORTILLO-FLORES,

Petitioner,

v.

WILLIAM P. BARR, Attorney General,

Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: May 13, 2020                              Decided: September 2, 2020

Before THACKER, QUATTLEBAUM, and RUSHING, Circuit Judges.

Petition denied by published opinion. Judge Quattlebaum wrote the opinion, in which Judge Rushing joined. Judge Thacker wrote a dissenting opinion.

**ARGUED:** Alexandra Maria Williams, Benjamin James Osorio, MURRAY OSORIO PLLC, Fairfax, Virginia, for Petitioner. Sarah Kathleen Pergolizzi, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Joseph H. Hunt, Assistant Attorney General, Holly M. Smith, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

QUATTLEBAUM, Circuit Judge:

Hernan Alexander Portillo-Flores ("Portillo") petitions for review of the Board of Immigration Appeals' ("BIA") decision affirming an Immigration Judge's ("IJ") denial of his application for asylum, withholding of removal and protection under the Convention Against Torture ("CAT"), and ordering his removal from the United States to El Salvador. In seeking a reversal of the BIA's decision, Portillo confronts a "narrow and deferential" standard of review. *Djadjou v. Holder*, 662 F.3d 265, 273 (4th Cir. 2011).

Like offensive linemen on a football team, standards of review are not glamorous or exciting. But that does not mean they are unimportant. To the contrary, standards of review are "elemental expression[s] of judicial restraint" that "focus reviewing courts upon their proper role when passing on the conduct of other decision-makers." *Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 320, 321 (4th Cir. 2008). In doing so, standards of review designate a "primary decision-maker other than the reviewing court" and prescribe a level of deference meant to "safeguard the superior vantage points of those entrusted with primary decisional responsibility." *Id.* at 321.

These principles of primacy and deference are particularly pertinent for immigration decisions, where "the admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" *See Trump v. Hawaii*, 138 S. Ct. 2392, 2418 (2018) (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)); *Blanco de Belbruno v. Ashcroft*, 362 F.3d 272, 278–79 (4th Cir. 2004); *see also Hampton v. Mow Sun Wong*, 426 U.S. 88, 101 n. 21 (1976). In the asylum context, where "the law entrusts the agency to make the basic asylum

2

eligibility decision . . . 'judicial judgment cannot be made to do service for an administrative judgment.' Nor can an 'appellate court . . . intrude upon the domain which Congress has exclusively entrusted to an administrative agency.'" *I.N.S. v. Orlando Ventura*, 537 U.S. 12, 16 (2002) (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943)) (internal citation omitted).

Often, standards of review, like offensive linemen in a football game, control the outcome of an appeal. That is the case here. We need only find substantial evidence in the record to support the findings that Portillo was not entitled to relief, and, because we do, we deny Portillo's petition for review.

## I.

Portillo, a native and citizen of El Salvador, entered the United States in October 2015 near Eagle Pass, Texas as a 15-year-old unaccompanied juvenile. He soon encountered U.S. Customs and Border Protection agents and admitted to illegally entering the country by crossing the Rio Grande.

The Department of Homeland Security ("DHS") served Portillo with a Notice to Appear for removal proceedings, charging him under the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(6)(A)(i), as a noncitizen present in the United States without having been admitted or paroled. He was released to live with family, and the DHS later initiated the removal proceedings.

Portillo conceded removability but applied for asylum, withholding of removal and protection under the CAT. He claimed that if he returns to El Salvador, he would be

3

"harmed, tortured, or killed" by the gang MS-13 because of his membership in a particular social group—namely, "a member of [his] sister's family." J.A. 780. He also stated that Salvadorian police will not protect him because they are "working along with MS-13 in order to fulfill their threats to [his] family." *Id.*

A.

At Portillo's individual removal hearing, Portillo and his sister, Paola, testified before the immigration court. Paola said that the family's problems with MS-13 began in 2013 when she was living with Portillo and their mother in Ciudad Delgado, El Salvador. A local gang leader, known as "El Pelon," wanted her to be his girlfriend. Paola testified that when she resisted, El Pelon told her that if she failed to submit to his demands, "he might kill [her] mother and/or [her] brother." J.A. 201. One day, as she left school, El Pelon confronted Paola and told her that if she continued to refuse him, "something's going to happen" to Portillo and their mother. J.A. 203. Paola testified that neither she nor her family went to the police about these threats. Instead, the family sent her to the United States.

Portillo testified that he was not told about these threats. But, in the months after Paola's departure from El Salvador, members of MS-13 approached him five or six times with knives and a handgun, asking for information about her location. Once, a group of gang members told Portillo, who was then 14 years old, that if he failed to help them, he would "get hurt." J.A. 139. Portillo also testified that the gang beat him three or four times. During this period, he would sometimes "get home without shoes, beaten up, with bruises, and even sometimes without a shirt," but he never told his family what was happening. J.A. 205. Portillo said the last beating he received from MS-13 was the worst. Although he

4

conceded he received no medical treatment after this incident, Portillo testified that he almost died.

Portillo said that, after he was last approached by MS-13, his mother sent him to live with his uncle on a ranch in Chalatenango, about two hours away from Ciudad Delgado. While there, Portillo said he did not leave the ranch and had food brought to him because he feared MS-13 would find him.

During the time Portillo was away, his mother told him that four uniformed police officers came to the house looking for him, and that two gang members were watching the visit from a distance. Paola said their mother felt this interaction meant "El Pelon or the gang was linked to the police because they were asking about [Portillo]." J.A. 206. Following the visit, Portillo said his mother moved to an apartment in Ciudad Delgado and, as far as he knows, she has not been contacted by the gang since.

Portillo testified that although he had no interaction with the gang in Chalatenango, he left after about a month because he was afraid that the gang would find him. He claimed he could not simply hide in another region of El Salvador because MS-13 is "all over the country," and that, regardless of where he moved, they may be able to find him. J.A. 152. Portillo left El Salvador and entered the United States in October of 2015. Portillo said he never went to the police about the conduct of the MS-13 gang members because he "knew that the police did not have the capacity to protect [him] from that gang." J.A. 147.

In addition to this testimony, Portillo submitted documents in support of his application for relief, including reports on country and gang conditions in El Salvador, as

5

well as statements from family members and friends. However, Portillo conceded that his mother is the only other person with first-hand knowledge of his treatment by MS-13.

B.

The immigration judge found Portillo and his sister to be credible witnesses. Yet, she denied his application for asylum, withholding of removal and protection under the CAT.

Regarding the requirements for asylum, the IJ first found that, although Portillo was threatened and beaten by members of MS-13, his "injuries did not require any medical attention and based on that, . . . the level of harm that [Portillo] experienced does not rise to the level of persecution." J.A. 79. And while Paola testified "that she received death threats towards her mother and brother," the IJ declined to find "that the death threats the sister received could be imputed" to Portillo. J.A. 80. However, the IJ noted that if the BIA determined that the threats could be imputed to Portillo, he may be able to establish past persecution "since death threats constitute harm rising to the level of persecution." J.A. 80 (citing *Hernandez-Avalos v. Lynch*, 784 F.3d 944 (4th Cir. 2015)).

The IJ also found that "the harm [Portillo] suffered did not occur at the hands of the El Salvadoran government or an agent that the government is unwilling or unable to control." J.A. 80. She emphasized that Portillo did not report his treatment by MS-13 to the police, and that, based on reports submitted by the government, El Salvador has taken steps to address gang activity and police corruption.

Echoing her past-persecution analysis, the IJ also ruled that Portillo did not otherwise establish a well-founded fear of future persecution. Accordingly, she concluded

6

Portillo failed to establish his eligibility for asylum. And because Portillo failed to meet "the lower asylum standard," he "necessarily fail[ed] to satisfy the more stringent standard of withholding of removal." J.A 81.

As to Portillo's CAT claim, the IJ held that Portillo did not "provide[] evidence that shows that it is more likely than not that he specifically would be tortured in the future in El Salvador with the consent or acquiescence of the government." J.A. 81. As a result, she denied his request for relief under the CAT.[1]

## C.

Portillo timely appealed the IJ's decision to the BIA, but the BIA dismissed his appeal. First, it found "no clear factual or legal error" in the IJ's determination that Portillo did not establish past persecution or a well-founded fear of persecution on a protected ground. J.A. 9. Regarding past persecution, the BIA found that the IJ was not required to

---

[1] Additionally, while the IJ acknowledged that members of an immediate family may constitute a protected social group, she concluded that "the fact that gang members sought information from [Portillo] about his sibling without more does not support [his] claim that the gang intended to persecute him on account of his family." J.A. 80. Therefore, the IJ found that Portillo did not establish "a nexus between the harm suffered and a protected ground." J.A. 80. On review, the BIA found that the IJ was correct in finding that Portillo "did not meet his burden of establishing the requisite nexus between the alleged harm he fears and his membership in a particular social group." J.A. 10. Instead, it concluded that the record supported the IJ's finding that his fears are of "an act of random criminal or gang violence," and not motivated by a protected ground. J.A. 10. On appeal, Portillo contends the IJ and the BIA erred in concluding he failed to connect the alleged persecution to his status as a member of his sister's family. But the government does not dispute Portillo's contention that the IJ and BIA erred in finding an insufficient nexus between the alleged persecution and Portillo's membership in a protected group. Therefore, we will not address that issue. *See Tairou v. Whitaker*, 909 F.3d 702, 707 (4th Cir. 2018).

7

apply a child-specific standard of proof, and that she "correctly found that although [Portillo] was threatened and beaten on several occasions in El Salvador, he never suffered any serious physical harm requiring medical attention." J.A. 9. Next, it concluded that unlike prior Fourth Circuit cases such as *Tairou v. Whitaker*, 909 F.3d 702 (4th Cir. 2018), where a death threat was enough to constitute past persecution, Portillo did not *directly* receive a death threat. Instead, the BIA affirmed the IJ's conclusion, and found that "the alleged 'death threat' here was made to [Portillo's] sister—not to [Portillo]." J.A. 10.

Additionally, the BIA held that the IJ did not clearly err in concluding that Portillo failed to demonstrate that the harm he fears in El Salvador "was or would be inflicted by the government or by individuals or groups that the government is unwilling or unable to control." J.A. 11. Like the IJ, the BIA emphasized Portillo's failure to report any threats or mistreatment to the police or government officials in El Salvador. Accordingly, the BIA concluded that Portillo "is not a refugee for asylum purposes," and that "he has not satisfied the higher burden of proof for withholding of removal." J.A. 11.

Turning last to his CAT claim, the BIA held that Portillo did not sufficiently show that it is more likely than not that he will be tortured "by or at the instigation of or with the consent or acquiescence [to include willful blindness] of a public official or other person acting in an official capacity." J.A. 11 (quoting 8 C.F.R. §§ 1208.16(c)(2), 1208.18(a)(1)). Accordingly, it concluded that the IJ did not clearly err in denying his CAT claim.

## II.

Portillo timely petitioned for review of the BIA's decision affirming the IJ's denial of his application for asylum, withholding of removal and relief under CAT, and ordering his removal from the United States to El Salvador. We have jurisdiction to review a final order of removal under 8 U.S.C. §§ 1252(a)(1), (a)(5).

On appeal, Portillo argues that, with respect to the asylum and withholding of removal claims, the IJ and BIA erred in finding that he did not carry his burden to prove past persecution or establish that the government of El Salvador is unwilling or unable to protect him from MS-13. He also argues that the IJ and BIA failed to conduct a meaningful CAT analysis.

## III.

We begin with Portillo's arguments concerning asylum and withholding of removal. The Immigration and Nationality Act ("INA") authorizes the Attorney General to grant, at his discretion, asylum to applicants who qualify as refugees under 8 U.S.C. § 1102(a)(42)(A). *See* 8 U.S.C. §§ 1158(a)(1), (b)(1)(A); *Mejia v. Sessions*, 866 F.3d 573, 578 (4th Cir. 2017).

To qualify as a refugee, an applicant bears the burden of proving that he "is unable or unwilling to return to" his country of origin "because of [past] persecution or a well-founded fear of [future] persecution on account of," as relevant here, his "membership in a particular social group." 8 U.S.C. §§1101(a)(42)(A), 1158(b)(1)(B)(i); 8 C.F.R § 1208.13(b); *Orellana v. Barr*, 925 F.3d 145, 151 (4th Cir. 2019). In addition, "an

applicant alleging past persecution must establish either that the government was responsible for the persecution or that it was unable or unwilling to control the persecutors." *Mulyani v. Holder*, 771 F.3d 190, 198 (4th Cir. 2014). But, because asylum is a form of discretionary relief, "the Attorney General is *not required* to grant asylum to everyone who meets the definition of refugee." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 428 n. 5 (1987) (emphasis original).

The elements of a claim for withholding of removal are generally the same for an asylum claim. S*ee Camara v. Ashcroft*, 378 F.3d 361, 367 (4th Cir. 2004). However, in contrast to an asylum claim, "[i]f an applicant for withholding of removal establishes her claim, the Attorney General *cannot* remove her to her native country." *Mejia*, 866 F.3d at 578–79 (emphasis original, citation omitted). Accordingly, "the standard of proof for withholding of removal is higher, requiring the applicant to establish a 'clear probability' of persecution, rather than the less stringent 'well-founded fear' of persecution that will suffice to make out an asylum claim." *Salgado-Sosa v. Sessions*, 882 F.3d 451, 456–57 (4th Cir. 2018). "Necessarily, an applicant who fails to meet the lower standard for showing eligibility for asylum will be unable to satisfy the higher standard for showing withholding of removal." *Mulyani*,771 F.3d at 198 (internal quotation marks and citation omitted).

A.

Portillo argues that the IJ and BIA committed three errors in finding that the harm he suffered in El Salvador did not rise to the level of persecution. Portillo first claims that in conducting their past-persecution analyses, the IJ and BIA failed to consider the harmful acts he and his sister suffered from the perspective of a child. Second, he argues that even

10

from an adult perspective, the physical abuse he suffered rose to the level of persecution. Third, he argues that MS-13 threatened to kill him, which, alone, constitutes persecution. However, we need not address these arguments because, even if Portillo were to prevail on them, under our standard of review, we must uphold the BIA's determination that he is not eligible for asylum or withholding of removal because he did not establish that the Salvadoran government was unable or unwilling to control MS-13.[2]

B.

When, as here, an applicant purports to fear persecution by a private actor, such as MS-13, "[w]hether a government is 'unable or unwilling to control' a private actor 'is a factual question'" that we review for substantial evidence. *Orellana*, 925 F.3d at 151 (quoting *Crespin-Valladares v. Holder*, 632 F.3d 117, 128 (4th Cir. 2011)).[3] Because this standard of review is so important to the outcome of this case, we address it before considering the merits of Portillo's claim.

---

[2] A claim for asylum or withholding of removal based on a well-founded fear of future persecution, like claims based on past persecution, require the applicant to show the government would be unable or unwilling to control the alleged persecution by a private actor. *See Orellana*, 925 F.3d at 151. Therefore, we likewise need not address the BIA's determinations that Portillo did not have a well-founded fear of future persecution.

[3] As always, we review any legal questions de novo. *Hernandez-Avalos v. Lynch*, 784 F.3d 944, 948 (4th Cir. 2015).

1.

"The phrase 'substantial evidence' is a 'term of art' used throughout administrative law to describe how courts are to review agency factfinding." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *T-Mobile South, LLC v. Roswell*, 135 S. Ct. 808, 815 (2015)). Generally, "[u]nder the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek*, 139 S. Ct. at 1154 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "[T]he threshold for such evidentiary sufficiency is not high. Substantial evidence . . . is more than a mere scintilla. It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek*, 139 S. Ct. at 1154); *see Contreras-Mejia v. Barr*, No. 19-1120, 2020 WL 2569293, at *4 (4th Cir. May 21, 2020).

Substantial evidence is codified as the "highly deferential" standard of review for the BIA's factual findings in 8 U.S.C. § 1252(b)(4). *Nasrallah v. Barr*, 140 S.Ct. 1683, 1692 (2020); *Tang v. Lynch*, 840 F.3d 176, 180 (4th Cir. 2016). This statute limits our review to "the administrative record on which the order of removal is based," and instructs that "the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(A), (B); *see I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 481 n. 1 (1992) ("To reverse the BIA finding we must find that the evidence not only *supports* [the opposite] conclusion, but *compels* it . . . .") (emphasis original). Stated differently, it requires us to "uphold [the BIA's] factual findings unless no rational factfinder could agree with the [BIA's] position." *Temu v. Holder*, 740

12

F.3d 887, 891 (4th Cir. 2014). Such a narrow standard of review "recognizes the respect we must accord both the BIA's expertise in immigration matters and its status as the Attorney General's designee in deportation decisions." *Huaman-Cornelio v. Bd. of Immigration Appeals*, 979 F.2d 995, 999 (4th Cir. 1992).

Ultimately, "[w]e may not disturb the BIA's determinations on asylum eligibility so long as those determinations 'are supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" *Mulyani*, 771 F.3d at 197 (quoting *Tassi v. Holder*, 660 F.3d 710, 719 (4th Cir.2011)). And in conducting this review, "[w]e may not reweigh the evidence, and, [e]ven if the record plausibly could support two results: the one the IJ chose and the one [the petitioner] advances, reversal is only appropriate where the court find[s] that the evidence not only supports [the opposite] conclusion, but *compels* it." *Tang*, 840 F.3d at 180 (internal quotation marks and citations omitted) (emphasis original).

2.

Guided by this standard of review, we turn to Portillo's challenge to the BIA's finding that he did not establish that the Salvadoran government was unable or unwilling to control MS-13. In so doing, "our power to review an order of removal is limited to the 'final' order," which generally "come[s] not from the IJ, but 'from the BIA, the highest administrative tribunal.'" *Mulyani*, 771 F. 3d at 196 (quoting *Martinez v. Holder*, 740 F. 3d 902, 908 n.1 (4th Cir. 2014)). However, when "the BIA adopts the IJ's opinion and supplements it with its own reasoning, we review both rulings." *Hernandez-Avalos v. Lynch*, 784 F.3d 944, 948 (4th Cir. 2015); *see also Martinez*, 740 F.3d at 908 n.1

(explaining that decisions reviewing both IJ and BIA decisions "involve BIA decisions that incorporate some part of the IJ opinion as part of the BIA's final order").

Initially, the IJ found that because Portillo did not report the threats or beatings to the police, and El Salvador has taken steps to address gang activity and police corruption, the harm that Portillo suffered "did not occur at the hands of the El Salvadoran government or an agent that the government is unwilling or unable to control." J.A 80. On review, the BIA determined that the IJ's conclusion was not clearly erroneous, and emphasized that Portillo "testified that he never reported any threats or mistreatment by the gang members to the police or to any other government official in El Salvador." J.A. 11. These conclusions are consistent with our precedent, which holds that "an applicant who relinquishes a protective process without good reason will generally be unable to prove [his] government's unwillingness or inability to protect [him]." *Orellana,* 925 F.3d at 153.

Portillo does not contest that neither he, nor anyone in his family, reported MS-13's threats and physical abuse to the police or another government agent. Instead, he cites our previous holding that "there is no requirement that an applicant persist in seeking government assistance when doing so (1) 'would have been futile' or (2) 'have subjected [him] to further abuse.'" *Id.* (quoting *Ornelas-Chavez v. Gonzales*, 458 F.3d 1052, 1058 (9th Cir. 2006)). He then argues that he and his sister credibly testified why they were justified in not going to the police, and, more generally, that he and his family "believed that the police were in cahoots with the MS-13 gang . . . ." Appellant's Op. Br. at 18. However, this testimony does not allow us to disturb the BIA's findings because the record,

14

viewed as a whole, does not compel the conclusion that going to the police would have been futile or subjected Portillo to further abuse. *See Elias-Zacarias*, 502 U.S. at 481 n. 1.

At his removal hearing, Portillo provided contradictory testimony on this issue. He first asserted that he "knew that the police did not have the capacity to protect [him] from the gang" because he had a friend who was found dead after he reported MS-13 to the police. J.A. 147. But, during subsequent questioning, he seemed to walk back his original claim by stating, "[the police] might have been able to protect me, but the point is that my mother was still there." J.A. 149.[4] And later, during cross examination, he conceded that "[the police] might have been able to do something against gang members. I don't really know." J.A. 175.

Paola, for her part, testified that there was an understanding that the police would not do anything, and that their mother believed that the police were working with MS-13 "because [Portillo] was doing nothing wrong and [the police] came looking for him." J.A. 207. Yet, when Portillo was asked if he thought the visit from the police demonstrated that they were working with MS-13, he said, "I'm not sure." J.A. 175. Portillo's contradictions and concessions constitute more than a scintilla of evidence supporting the BIA's decision.

Moreover, the record does not compel the conclusion that, even if Portillo had sought official protection, the government of El Salvador was otherwise unwilling or unable to control the gang. *See Elias-Zacarias*, 502 U.S. at 481 n. 1. In finding that El Salvador has taken steps to address gang activity and police corruption, the IJ relied, in

---

[4] Portillo also appeared to acknowledge that the police arrested a gang member in his friend's case.

part, on the 2016 and 2017 U.S. State Department Country Reports on Human Rights in El Salvador. J.A. 81. And, in affirming the IJ's finding, the BIA cited the pages of the IJ decision that discuss those reports. We have "previously noted that State Department reports are 'highly probative evidence' of conditions in foreign countries," *Suarez-Valenzuela v. Holder*, 714 F.3d 241, 247–48 (4th Cir. 2013) (quoting *Gonahasa v. INS*, 181 F.3d 538, 542 (4th Cir. 1999)). Therefore, the policies documented in the reports bolster the evidence in the record supporting the BIA's decision. *See Gonahasa*, 181 F.3d at 542.

While we appreciate Portillo's testimony that he feared going to the police, his fear does not eliminate the evidence in the record supporting the BIA's conclusion. Under the standard of review that we are compelled to follow, if there is more than a scintilla of evidence in the record to support this factual finding, we must uphold it "unless no rational factfinder could agree with the [BIA's] position." *Tang*, 840 F.3d at 180 (quoting *Temu*, 740 F.3d at 891). The BIA's decision that Portillo failed to establish the Salvadorian government was unwilling or unable to control MS-13 is "supported by reasonable, substantial, and probative evidence in the record considered as a whole." *Elias-Zacarias*, 502 U.S. at 481 (citation omitted). Therefore, it must stand, regardless of whether we might have reached a different decision.

Because the record does not compel the conclusion that the Salvadoran government was unwilling or unable to control MS-13, we must uphold the IJ and BIA's conclusion that Portillo does not qualify as a refugee under 8 U.S.C. § 1102(a)(42)(A), and is ineligible for asylum and withholding of removal. *See Mulyani*, 771 F.3d at 197–99.

16

IV.

Finally, we turn to Portillo's argument that the IJ and BIA erred by denying his application for CAT protection. In reviewing a denial of relief under CAT, "[t]he standard of review is the substantial-evidence standard. The agency's 'findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Nasrallah*, 140 S.Ct. at 1692 (quoting 8 U.S.C § 1252(b)(4)(B)).

An alien seeking CAT protection bears the burden to show that "it is more likely than not that he or she would be tortured" in the country of removal. *Rodriguez-Arias v. Whitaker*, 915 F.3d 968, 971 (4th Cir. 2019) (quoting 8 C.F.R. § 1208.18(a)(1)). And "torture" is defined as "(1) 'any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person' in a manner that is (2) 'by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.'" *Rodriguez-Arias*, 915 F.3d at 971 (quoting 8 C.F.R. § 1208.18(a)(1)).

Portillo raises three issues concerning his CAT claim. First, he argues that the IJ's determination "that 'the government' of El Salvador will not consent or acquiesce to his torture" constitutes "obvious legal error." Appellant's Op. Br. at 20. He claims that the proper standard is whether "a public official or other person acting in an official capacity" will consent or acquiesce to the torture. *Id.* (quoting 8 C.F.R. § 1208.18(a)(1) (2019) (emphasis omitted). Second, Portillo challenges the brevity of the IJ and BIA's CAT analysis, claiming they neither address all of his arguments nor adequately explain the basis of their CAT decisions. Third, he asserts that the BIA committed legal error by "engaging

17

in fact-finding in the first instance of whether a public official was likely to acquiesce to Mr. Portillo's torture." *Id.* at 21.

First, we disagree with Portillo's argument that the IJ committed a legal error, much less an obvious one, in finding that Portillo failed to establish that it was more likely than not that he would be tortured in El Salvador "with the consent or acquiescence of the government." J.A. 8. The language of the IJ's conclusion follows the established law of this Circuit. Namely, to qualify for protection under the CAT, a petitioner bears the burden to "show that, if removed, it is 'more likely than not that he or she would be tortured' with the consent or acquiescence of the government" in their country of origin. *Salgado-Sosa*, 882 F.3d at 456 (citing 8 C.F.R. §§ 1208.16(c)(2), 1208.18(a)(1)).

Moreover, the BIA, in affirming the IJ's denial of relief under the CAT, stated as follows:

> The record also supports the Immigration Judge's determination that the respondent has not met his burden of establishing his claim under the Convention Against Torture inasmuch as he has not shown that it is more likely than not that he will be tortured "by or at the instigation of or with the consent or acquiescence [to include willful blindness] of a public official or other person acting in an official capacity" in El Salvador (IJ at 6). 8 C.F.R.§§1208.16(c)(2),1208.18(a)(1); *see Matter of Z-Z-O-*, 26 I&N Dec. 586 (BIA 2015) (explaining that an Immigration Judge's predictive findings of what may or may not occur in the future are findings of fact, which are reviewed under the "clear error" standard); *see also Lizama v. Holder*, 629 F.3d 440, 449 (4th Cir. 2011) (discussing Convention Against Torture standard).

J.A. 11. As Portillo acknowledges, this language sets forth the appropriate legal standard. Therefore, Portillo's argument that his CAT claim was denied based on an obvious legal error is without merit.

18

Next, Portillo argues that the IJ and BIA's CAT analyses were inadequate because they failed to address his fears that the police are complicit with MS-13's efforts to find him, or his "particularized risks of torture, country conditions, and mass human rights violations in the country of removal." Appellant's Op. Br. at 21–22. However, this argument ignores the first sentence of the IJ's CAT analysis, which states that she considered the country conditions described in the 2016 and 2017 State Department Country Reports on Human Rights in El Salvador. J.A. 81. Further, in affirming the IJ's CAT findings, the BIA explicitly cited the pages of the IJ decision that referenced those reports. *See* J.A. 4. The BIA also held that "[a]lthough [Portillo] claims that his grandmother and sister 'believe' that the Salvadoran police are working with local MS gang members . . ., [he] has not presented sufficient evidence demonstrating that he will be tortured by or with the requisite acquiescence of any government official in El Salvador." J.A. 11. Accordingly, the BIA's decision that the IJ did not err in finding that Portillo did not establish his eligibility for CAT protection is supported by substantial evidence and does not constitute "a wholesale failure [by] the IJ and BIA to consider evidence" offered to support his CAT claim. *Rodriguez-Arias*, 915 F.3d at 974.

And Portillo's argument that the IJ and the BIA failed to adequately explain how they arrived at their decisions fares no better. The IJ stated she considered the evidence of conditions in El Salvador, but that Portillo had not proven that it was more likely than not that he would be tortured with the consent or acquiesce of the Salvadoran government. Then, on review, the BIA cited to the applicable law, the relevant portions of the IJ decision and additional evidence in the record before concluding that the IJ did not err in finding

19

that Portillo failed to offer sufficient evidence to support his claim. Although the BIA's decision could have been more comprehensive, it was not required to discuss every piece of evidence in the record. *See Ai Hua Chen v. Holder*, 742 F.3d 171, 179 (4th Cir. 2014) (citation omitted). Instead, the BIA "announce[d] [its] decision in terms sufficient to enable a reviewing court to perceive that they have heard and thought and not merely reacted" to the evidence. *Id.* Therefore, reversal is not warranted.

Finally, the BIA did not "engage in fact-finding in the first instance of whether a public official was likely to acquiesce to Mr. Portillo's torture . . . ." Appellant's Op. Br. at 21. It simply found "no clear error" in the IJ's denial of CAT protection, and reiterated the IJ's finding that Portillo had not provided sufficient evidence to establish that he would be tortured with the requisite acquiesce of a Salvadoran government official. J.A. 11.

In conclusion, substantial evidence in the record supports the BIA's determination that Portillo was not eligible for CAT protection, and the BIA did not otherwise err in dismissing the appeal of the IJ's denial of Portillo's CAT application.

V.

Our good friend and colleague in dissent disagrees with our conclusions. Instead, Judge Thacker would decline to uphold the IJ and the BIA decisions because they are too "cursory" and fail "to engage with [the] applicant's arguments and evidence." *Post* at 24. At least regarding the points on which our decision turns—whether Portillo established that the Salvadoran government was unwilling or unable to control MS-13, and whether he

20

established he will be tortured by or with the consent or acquiescence of a Salvadoran official—we cannot agree.

Importantly, the IJ and the BIA are not required to discuss every piece of evidence in the record. *Ai Hua Chen*, 742 F.3d at 179. And while they are required to "announce their decision[s] in terms sufficient to enable a reviewing court to perceive that they have heard and thought and not merely reacted," *id.*, here, their decisions satisfy this standard.

To review, the IJ explained that the State Department Country Reports on Human Rights in El Salvador indicate that "the government of El Salvador has put measures into place to address criminal activity and has arrested gang members and corrupt police officers." J.A. 81. "Typically, we have approved of the [agency's] proclivity for finding State Department Country Reports to be the definitive word in asylum cases." *Ai Hua Chen*, 742 F.3d at 179. And while we have cautioned against "treating these Country Reports as 'Holy Writ' immune to contradiction," *id.* (citation omitted), here, contradictory evidence in the record does not compel a contrary conclusion. *See Elias-Zacarias*, 502 U.S. at 481 n. 1. Additionally, the BIA acknowledged Portillo's claim that "his grandmother and sister 'believe' that the Salvadoran police are working with local MS gang members," but concluded that he did not provide sufficient corroborating evidence to conclude "that he will be tortured by or with the requisite acquiescence of any government official in El Salvador." J.A. 11.

To be sure, the IJ and the BIA could have explained their conclusions in more detail. But by pointing to "highly probative evidence" in the State Department Country Reports of the Salvadoran government's efforts to combat gang violence, *Gonahasa*, 181 F.3d at

21

542, and by specifically addressing Portillo's explanation for why he did not report the gang's abuse, the IJ and the BIA decisions indicate that they "heard and thought" and did "not merely react[]" to the arguments and evidence before them. *Ai Hua Chen*, 742 F.3d at 179 (internal quotation marks and citation omitted). And, as the BIA noted, Portillo did "not meaningfully challenge[]" the IJ's conclusion that the Salvadoran government was unwilling or unable to control MS-13 in his appeal to the BIA. J.A. 4. In fact, the record shows that the brief he submitted to the BIA essentially omitted any challenge to the BIA's findings on this issue. It is therefore unfair to criticize the BIA for not more thoroughly addressing an argument that Portillo did not bother to make.

Further, despite our colleague's concern, we disagree that the evidence Portillo offered concerning whether government officials were unwilling and unable to specifically protect Portillo, or were otherwise involved in his abuse, was unrebutted. As noted above, at his removal hearing, Portillo himself provided contradictory testimony on this issue, ultimately conceding that "[the police] might have been able to do something against gang members. I don't really know." J.A. 175. And when asked about the veracity of his sister and mother's claim that the police were specifically involved in his mistreatment by MS-13, he admitted, "I'm not sure." J.A. 175.

Last, our colleague asserts that we attempt to do the work of the IJ and the BIA. *Post* at 34. We disagree. Instead, we merely performed the work required of us by the prescribed standard of review. Under it, we must uphold the BIA's determinations on asylum eligibility "so long as those determinations 'are supported by reasonable, substantial, and probative evidence *on the record considered as a whole*.'" *Mulyani*, 771

22

F.3d at 197 (quoting *Tassi*, 660 F.3d at 719) (emphasis added). Accordingly, our responsibility is to look to the whole record to "ensure that substantial evidence supports the BIA's judgment." *Mulyani*, 771 F.3d at 200. That is precisely what we have done here.

## VI.

For the foregoing reasons, we deny Portillo's petition for review of the BIA's decision affirming the IJ's denial of his application for asylum, withholding of removal and protection under the CAT, and ordering his removal from the United States to El Salvador. Accordingly, Portillo's Petition is

*DENIED.*

THACKER, Circuit Judge, dissenting:

The majority opinion begins its analysis with a reminder of the applicable standard of review, emphasizing the importance of deference in this context. But the majority fails to mention a threshold requirement for the application of deference -- in order to be accorded deference, agency decisionmakers below must conduct sufficient analysis to which we can defer. *See Cordova v. Holder*, 759 F.3d 332, 338 (4th Cir. 2014) ("[T]he Supreme Court long ago instructed that 'the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained.'" (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943))). Here, neither the Immigration Judge ("IJ") nor the Board of Appeals ("BIA") provide even the bare minimum level of explanation that our precedent requires. This failure is an abuse of discretion.

The agency decisions here are precisely the kinds of cursory opinions we have repeatedly rejected for their failure to engage with an applicant's arguments and evidence. I therefore respectfully dissent.

## I.

In this case, we are called upon to address Petitioner's claims for asylum, withholding of removal, and relief pursuant to the Convention Against Torture ("CAT").

In 2013, Petitioner was living with his mother and sister in Ciudad Delgado, El Salvador. "El Pelon," a local MS-13 group leader, began calling and texting Petitioner's sister, Paola, then a student in the tenth grade. El Pelon indicated he wanted Paola to be

24

his girlfriend and told her that if she failed to submit to his demands, he might kill her mother and brother. El Pelon began following Paola and would have other gang members approach her and issue threats. Paola eventually informed her mother of El Pelon's continuing threats. As a result, the family decided to send Paola to the United States for her safety.

After Paola fled the country, El Pelon's crew began targeting Petitioner seeking information about Paola's location. MS-13 approached Petitioner on five or six occasions over the next several months, always asking him about Paola. The gang members were armed with knives and guns each time they contacted Petitioner. At the time of these incidents, Petitioner was only 14 or 15 years old. Three or four of the times that MS-13 approached Petitioner, the gang members beat him up.

Petitioner's mother saw him arrive home several times without shoes, beaten up with bruises, and sometimes shirtless. The final beating Petitioner received was so severe that he testified that he "almost die [sic] on that occasion." A.R. 143.[1] This last beating prompted Petitioner to disclose the ongoing issue to his mother. Concerned for her child's safety, Petitioner's mother decided to send Petitioner to stay on a ranch in Chalatenango, El Salvador, to live with his uncle. Petitioner testified that he believed MS-13 would have killed him if he had remained in Ciudad Delgado.

Once in Chalatenango, Petitioner remained in hiding. But soon, while Petitioner was in Chalatenango, "four people who were policemen working with the gang members

---

[1] Citations to the "A.R." refer to the Administrative Record filed by the parties in this appeal.

came to [Petitioner's mother's] house threatening [her] so that [Petitioner] would turn himself into [sic] the gang members." A.R. 290. Petitioner's mother saw El Pelon and another gang member standing outside in the alleyway behind the police during this encounter. Petitioner's sister testified that when her mother looked out the door during this encounter, her mother "saw . . . El P[e]lon, so she understood that El P[e]lon or the gang was linked to the police because they were asking about [Petitioner]." *Id.* at 206.

As a result of the threats, Petitioner's mother fled her house in Ciudad Delgado and now lives in hiding elsewhere in El Salvador. Petitioner's sister sends money for their mother's care to make sure her mother does not need to leave the house in her new location. The visit of the police to Petitioner's mother's house also prompted his mother and sister to decide to send Petitioner from El Salvador to the United States. He entered without inspection on approximately October 12, 2015. When he arrived in the United States, Petitioner was 15 years old.

United States Customs and Border Protection detained Petitioner upon his entry to the United States. On October 3, 2018, Petitioner received a hearing on the charge of removability before an IJ. Petitioner asserted claims for asylum, or in the alternative, for withholding of removal and protection pursuant to the CAT.

At Petitioner's hearing, his sister Paola testified as to her reasons for leaving El Salvador and her belief that had she stayed, El Pelon would have raped or killed her. She also testified with respect to El Pelon's threats against her brother. Specifically, Paola testified that had Petitioner remained in El Salvador, "if he had not been dead by now, that could have been a miracle from God." A.R. 208. She stated that she and her mother

26

thought it best to send Petitioner to the United States because "[i]t was going to come to the point that [the gang] w[as] going to be able to find him. And they weren't going to be using words anymore. He was going to get murdered." *Id.*

Petitioner testified that the gang threatened him the first time they approached him, specifically asking for Paola's whereabouts, and threatening that Petitioner was "going to get hurt." A.R. 139. El Pelon himself approached Petitioner at one point when he had been beaten up, asked questions about his sister, and threatened him. All of the beatings occurred in succession within a two or three month time frame before Petitioner went into hiding in Chalatenango, after which point the police (together with the gang) came looking for him at his mother's house.

Petitioner specifically stated that had he stayed in Ciudad Delgado, the MS-13 members "would have killed me because the last time they beat me up, they almost -- I almost died. And I believe they could have taken more reprisals against me." A.R. 146–47. Petitioner also testified that he did not go to the police "because [he] knew that the police did not have the capacity to protect [him] from th[e] gang," and also indicated that he believed the police who came to his mother's house are gang members. *Id.* at 145–47.

The IJ found both Petitioner and his sister Paola credible. Petitioner also filed numerous exhibits including declarations from family members corroborating his stated reasons for leaving El Salvador. Petitioner supplemented the testimonial evidence about the dangers in El Salvador and the inability of the police to protect him with expert analysis explaining how MS-13 can "operate . . . largely without police or military interference because of corruption and the Salvadoran government's inability to maintain order," and

27

how filing a police report can make matters worse because gang members will "seek to obtain the name of the person who reported [their activity] via their sources within the police, government and community and take revenge to send the message that others should not report similar crimes." A.R. 387. Additionally, Petitioner provided United States Department of State country conditions reports from the relevant years detailing "widespread corruption," as well as "weak rule of law, which contributed to high levels of impunity and government abuse, including unlawful killings by security forces." *Id.* at 440. These reports explain that, "[i]mpunity persisted despite government steps to dismiss and prosecute" bad actors within security forces, the justice system, and the executive branch. *Id.*

Ultimately, the IJ issued an oral decision denying Petitioner all requested relief and ordering his removal. The IJ acknowledged that MS-13 threatened to kill Petitioner but concluded that Petitioner failed to demonstrate a nexus between the threats and beatings and a protected ground sufficient to support his claim for asylum. The IJ then spent just a single brief paragraph on its determination that "the harm that [Petitioner] suffered did not occur at the hands of the El Salvadoran government or an agent that the government is unwilling or unable to control." A.R. 80. The IJ cited Petitioner's failure to report the threats or attacks to police and said simply that, though "[t]here is no doubt El Salvador has a high rate of crime," its government "has put measures into place to address criminal activity and has arrested gang members and corrupt police officers." *Id.* Finally, the IJ also decided that Petitioner failed to support his claim for relief pursuant to the CAT because he did not establish that it is more likely than not that he would suffer torture in El

Salvador with the consent or acquiescence of the government. The IJ's CAT analysis consisted of just three sentences. Petitioner timely filed a notice of appeal to the BIA.

The BIA dismissed Petitioner's appeal in a single member decision. The Board issued its own opinion, concluding that the IJ did not commit error as to any of Petitioner's three claims for relief. This opinion was only slightly more developed than the IJ's decision.

II.

When, as here, "the BIA adopts the IJ's opinion and supplements it with its own reasoning, we consider both rulings." *Cruz v. Sessions*, 853 F.3d 122, 128 (4th Cir. 2017) (internal quotation marks omitted).

We review legal conclusions de novo. *Cordova v. Holder*, 759 F.3d 332, 337 (4th Cir. 2014). And we do not disturb the agency's factual determinations as long as those determinations "are supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Tassi v. Holder*, 660 F.3d 710, 719 (4th Cir. 2011) (citation omitted) (applying the substantial evidence standard to asylum claims); *Mulyani v. Holder*, 771 F.3d 190, 197 (4th Cir. 2014) (same, in the context of withholding of removal); *Lizama v. Holder*, 629 F.3d 440, 449 (4th Cir. 2011) (same, in addressing CAT relief). "We review factual findings for substantial evidence, and will reverse them only if any reasonable adjudicator would be compelled to conclude to the contrary." *Alvarez Lagos v. Barr*, 927 F.3d 236, 248 (4th Cir. 2019) (internal quotation marks omitted). But "an applicant for asylum is entitled to know that agency adjudicators reviewed all [his] evidence, understood it, and had a cogent, articulable basis for [their] determination that [his] evidence was

29

insufficient." *Orellana v. Barr*, 925 F.3d 145, 153 (4th Cir. 2019) (internal quotation marks omitted). And so are we.

"We must uphold the BIA's decision unless it is manifestly contrary to law and an abuse of discretion." *Cordova*, 759 F.3d at 337 (internal quotation marks omitted). "The BIA abuses its discretion if it fails to offer a reasoned explanation for its decision, or if it distorts or disregards important aspects of the applicant's claim." *Id.* (internal quotation marks omitted). "As a general matter, when the Board errs, 'the proper course . . . is to remand to the agency for additional investigation or explanation.'" *Alvarez Lagos*, 927 F.3d at 249 (quoting *INS v. Ventura*, 537 U.S. 12, 16 (2002) (per curiam)).

Where the adjudicating agency "misapplies the law in evaluating a request for asylum, the appropriate remedy is to remand so that the agency may apply the correct legal standard in the first instance." *Menghesha v. Gonzales*, 450 F.3d 142, 147 (4th Cir. 2006) (citing *Ventura*, 537 U.S. at 16).

## III.

### A.

#### 1.

The Immigration and Nationality Act ("INA") authorizes the Attorney General to grant asylum to any refugee. 8 U.S.C. § 1158 (b)(1)(A). The burden of proving eligibility for asylum rests with the applicant. 8 C.F.R. § 208.13(a). An asylum applicant must demonstrate either that he was subjected to past persecution or that he has a "well-founded fear of future persecution." 8 C.F.R. § 208.13(b). An applicant who establishes past

30

persecution is entitled to a rebuttable presumption of a well-founded fear of persecution. 8

C.F.R. § 208.13(b)(1).

Applicants must also establish that the persecution they fear would be inflicted "on

account of" their race, religion, nationality, membership in a particular social group, or

political opinion. 8 C.F.R. § 208.13(b)(2)(i)(A). To demonstrate the requisite "nexus," an

applicant must demonstrate that the protected ground is "at least one central reason" for his

persecution. *Alvarez Lagos v. Barr*, 927 F.3d 236, 250 (4th Cir. 2019) (internal quotation

marks omitted).

Finally, asylum applicants must establish that their alleged persecution occurred at

hands of their government or a party that government is unwilling or unable to control. *See*

*Mulyani v. Holder*, 771 F.3d 190, 198 n.4 (4th Cir. 2014).

2.

a.

Petitioner challenges the IJ and BIA determinations as to past persecution, nexus of

that persecution with a particular social group, and the government's inability or

unwillingness to control the party subjecting Petitioner to persecution.

The majority opinion declines to address Petitioner's arguments on past persecution

and nexus, reasoning that we need not reach those issues. In the majority's view,

irrespective of any error in the persecution and nexus analyses, we still must uphold the

BIA's determination that Petitioner did not establish that the El Salvadoran government

was unable or unwilling to control MS-13, and thus affirm denial of his asylum claim.

b.

To demonstrate that El Salvador's government was unable or unwilling to control the MS-13 gang members Petitioner fears, he provided country reports to supplement his sister's and his own credible testimony that reports to the local police are ineffective and can trigger retribution. *See* A.R. 147–48 (Petitioner explained he "knew that the police did not have the capacity to protect [him]" because a friend reported gang threats to the police and was killed). Despite this evidence, both the IJ and BIA held in the Government's favor.

"[A]n IJ is not entitled to ignore an asylum applicant's testimony" as to whether the government is unable or unwilling to control an applicant's persecutors. *Hernandez-Avalos v. Lynch*, 784 F.3d 944, 951 (4th Cir. 2015) (citation omitted). Here, both Petitioner and Paola credibly testified to their reasons for believing that filing a police report would only further increase Petitioner's risk of harm. Indeed, the IJ found them credible, "due to their demeanor, their candor, [that] they were responsive to all questions, and their testimony was consistent, both between their two testimonies and also with the written statements that are in the file." A.R. 79. Petitioner, Paola, their mother, and their grandmother all expressed the belief that the police visit to the mother's home occurred in conjunction with El Pelon's gang, members of which were standing nearby watching the visit. Yet neither the IJ nor BIA addressed this testimony at all. Further, neither the IJ nor BIA explained how evidence that El Salvador generally has arrested *some* MS-13 members and *some* corrupt police officers could rebut Petitioner's *specific* evidence about his persecutors and the police force in his area.

32

As the majority notes, "an applicant who relinquishes a protective process without good reason will generally be unable to prove [his] government's unwillingness or inability to protect [him]." *Orellana v. Barr*, 925 F.3d 145, 153 (4th Cir. 2019). But we have previously rejected a per-se reporting requirement, explaining that an applicant can be excused from seeking government intervention if to do so "(1) would have been futile or (2) have subjected [him] to further abuse." *Id.* (internal quotation marks omitted).

To support its determination that the IJ's finding on this issue was not clearly erroneous, the BIA explained, "[s]pecifically, as noted by the Immigration Judge, [Petitioner] testified that he never reported any threats or mistreatment by the gang members to the police or to any other government official in El Salvador." A.R. 4. Full stop. The BIA's swift conclusion of this analysis reads as though Petitioner's failure to report the threats and beatings was fatal to his claim.

But, again, we have expressly rejected such a per se reporting requirement. *Orellana*, 925 F.3d at 153. The application of such a requirement by the BIA was legal error, and legal errors "necessarily constitute an abuse of discretion." *Tassi v. Holder*, 660 F.3d 710, 725 (4th Cir. 2011) (citation omitted).

c.

Even if the BIA had acknowledged the correct legal standard -- which it did not -- Petitioner offered credible "unrebutted, legally significant evidence," *Tassi*, 660 F.3d at 719, that reporting the incidents to local police "would have been futile" or "subjected [him] to further abuse" or worse, *Cordova v. Holder*, 759 F.3d 332, 340 (4th Cir. 2014). This evidence was "arbitrarily ignored" by the IJ and BIA, who never so much as

33

mentioned any of the testimony on this point. *Tassi*, 660 F.3d at 719. Because the IJ ignored relevant evidence, and because the BIA adopted the IJ's flawed conclusion, I would remand to require reconsideration of Petitioner's evidence under the proper legal standard.

This is not a case in which the agency adjudicators made the evaluation in the first instance that Petitioner's failure to report was not justified. To the contrary, this is a case where the IJ and BIA both **completely omitted** the required analysis. The IJ and BIA failed to evaluate Petitioner's evidence justifying his failure to report and identifying law enforcement's inability to protect him. Both the IJ and BIA abdicated their responsibility to address Petitioner's evidence that he could not safely or effectively report the violence to the police.

The majority's analysis attempts to do this work for the IJ and BIA. *See* Majority Op. 14–15 (pointing to various statements in the record, suggesting that there might be support for the absent agency determination that Petitioner's failure to report was unjustified). To be sure, our standard of review is deferential to an agency's considered determination. It does not, however, authorize us to excuse misapplication of the law or to create a post hoc justification for an unexplained conclusion. We must require agencies to do their jobs so that we can do ours. We cannot review or defer to an analysis that does not exist in the first instance.

Still, the majority asserts that even *if* Petitioner had sought official protection, the record evidence does not compel the conclusion that the Salvadoran government was unwilling or unable to control MS-13. The majority opinion cites what it says is the IJ's

34

and BIA's reliance on 2016 and 2017 country reports from the United States Department of State detailing some efforts undertaken by El Salvador to address gang activity. *See* Majority Op. 16 (citing the IJ decision at A.R. 81 and "the BIA cit[ing] the pages of the IJ decision that discuss those reports," without citation). This means, even in the majority's charitable view, the agency decisionmakers' analysis of Petitioner's country reports boils down to the following two sentences: "[t]here is no doubt that El Salvador has a high rate of crime. [citing country reports]. However, the government of El Salvador has put measures into place to address criminal activity and has arrested gang members and corrupt police officers. [citing those same reports]." A.R. 81. This purported analysis is plainly insufficient.

Yet even if -- fully analyzed -- these country reports provide more than a mere scintilla of evidence that El Salvador is *willing* to attempt gang control, I fail to see how these reports provide evidence that the country is *able* to do so. Neither the IJ nor BIA opinions provide any analysis to that effect -- nor do they analyze Petitioner's evidence to the contrary.

d.

Agency adjudicators err when they "disregard[] and distort[] important aspects of the record." *Orellana*, 925 F.3d at 148. When disregarding "credible, significant, and unrebutted evidence," agency adjudicators must offer "specific, cogent reason[s]" for doing so. *Id.* at 152 (alterations in original) (quoting *Tassi*, 660 F.3d at 722). And critically, Petitioner was "entitled to know that agency adjudicators reviewed all [his] evidence, understood it, and had a cogent, articulable basis for its determination that [his]

35

evidence [was] insufficient." *Id.* at 153 (internal quotation marks omitted). In my view, both the IJ and BIA fell far short of that standard in this case.

Here, Petitioner provided credible evidence that Salvadoran law enforcement is -- at minimum -- unable to prevent violence against MS-13 targets, and in his specific case, that the local police may have been cooperating with the gang members targeting him. "[A]n IJ is not entitled to ignore an asylum applicant's testimony in making . . . factual findings." *Hernandez-Avalos*, 784 F.3d at 951 (citation omitted). Neither the IJ nor BIA even mentioned -- let alone evaluated -- Petitioner's claims that local law enforcement were involved with MS-13 and were unable to protect him from the gang's violence. Both adjudicating bodies simply treated Petitioner's failure to report that violence as fatal per se to his asylum claim without considering his reasons for not going to the police. The IJ merely noted that El Salvador "has put measures into place to address criminal activity and has arrested gang members and corrupt police officers," A.R. 81, and the majority would have us accept this as sufficient analysis of the country's ability to protect Petitioner from MS-13. This is not enough. Purported Salvadoran efforts to combat gang violence and corruption in general do not excuse the agency's failure to support its decision with the proper legal and factual analysis of Petitioner's specific circumstances.

Remand -- not deference -- is the appropriate treatment when "the grounds upon which the administrative agency acted [are not] clearly disclosed and adequately sustained." *Cordova*, 759 F.3d at 338 (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943)).

36

3.

Because I disagree with the majority's conclusion affirming the IJ and BIA determinations on the alleged protections afforded by the Salvadoran government, I also address Petitioner's arguments that the agency decisionmakers erred in their past persecution analysis. In my view, the agency adjudicators erred there, too.

B.

1.

With regard to past persecution, the IJ concluded that Petitioner failed to meet the evidentiary standard because, despite being "beaten and threatened on several occasions," "these injuries did not require any medical attention." A.R. 79. "[B]ased on that," the IJ determined "the level of harm that [Petitioner] experienced does not rise to the level of persecution." *Id.* The BIA affirmed the IJ's decision, noting that "he never suffered any serious physical harm requiring medical attention." *Id.* at 2. There is zero legal support for this position. There is no requirement that an asylum seeker be beaten badly enough to require medical attention. And rightfully so.

"Persecution involves the infliction or *threat* of death, torture, or injury to one's person," *Li v. Gonzales*, 405 F.3d 171, 177 (2005) (emphasis supplied) (internal quotation marks omitted), and, as we have recognized in other cases, "extortion itself can constitute persecution, even if the targeted individual will be physically harmed only upon failure to pay," *Zavaleta-Policiano v. Sessions*, 873 F.3d 241, 247 (4th Cir. 2017) (emphasis supplied) (internal quotation marks omitted). After Paola left El Salvador, gang members beat Petitioner repeatedly and promised "to do damage to him and to his family" if "he did

37

not turn Paola in to them." A.R. 290. Here, the unrebutted evidence is that Petitioner -- a 14–15 year old child -- experienced repeated beatings and physical threats, culminating in a beating so severe that Petitioner credibly testified that he "almost die[d]." *Id.* at 143. This is no "mere harassment." *Li*, 405 F.3d 171 at 177 (internal quotation marks omitted). We have previously deemed similar threats sufficient to support a finding of past persecution even absent any accompanying physical beatin*g*. *See Zavaleta-Policiano*, 873 F.3d at 245 ("if you do not want to pay you will pay with the blood of your children"). Thus, in light of our precedent -- and common sense -- I am convinced the substantial evidence compels the conclusion that Petitioner did experience past persecution in the form of severe beating and threats.

2.

a.

I am convinced of this conclusion even without tacking on the explicit threat to Petitioner's life as communicated to his sister, who was told that "if [she] did not accept what [El Pelon] wanted to do with [her], he might kill [her] mother and/or [her] brother." A.R. 201. Petitioner's sister testified that she believed El Pelon was capable of carrying out this threat "because the entire neighborhood was afraid of him." *Id.* She ultimately left El Salvador after El Pelon said she would "start seeing the consequences of the things [he is] capable of doing," saying, "in reality, if [she] love[d] her brother and [her] mother, [she had] better yield, otherwise something's going to happen." *Id.* at 203.

In this vein, the BIA attempted to distinguish Petitioner's situation from others where explicit death threats were communicated directly to the applicant, rather than a third

38

party.  But tellingly, as with its conjured up medical treatment requirement, the BIA cites zero precedent for a "recipient-only" rule or anything that otherwise supports its refusal to recognize the death threat against Petitioner communicated through his sister.  There is no precedent for this position.  In any event, even if the threats communicated had only been targeting his sister and mother, "[v]iolence or threats to one's close relatives is an important factor in deciding whether mistreatment sinks to the level of persecution."  *Baharon v. Holder*, 588 F.3d 228, 232 (4th Cir. 2009) (citation omitted).

b.

Moreover, denying -- as the Government does -- that Petitioner experienced past death threats before he left El Salvador is completely at odds with the record and the IJ's findings of fact and credibility.  *See* Resp't's Br. 12 (arguing Petitioner "received vague threats that did not include threats of death").

Here the MS-13 threats targeted Petitioner himself as well as his family members. Both Petitioner and his sister testified credibly to their belief that it was clear from the gang's multiple threats that "*[h]e* was going to get murdered."  A.R. 208 (emphasis supplied).

Thus, though I firmly believe Petitioner has met his burden of demonstrating past persecution even *without* the death threats, with the death threats appropriately recognized, there is all the more reason to grant Petitioner relief.

3.

a.

I readily conclude that substantial evidence compels the conclusion that Petitioner established past persecution, and that he, therefore, would be entitled to a rebuttable presumption as to a reasonable fear of future persecution. Yet neither the IJ nor BIA provides sufficient analysis on this point either.

The IJ's fear of future persecution analysis is actually unintelligible: "Although [Petitioner] has shown that he may suffer harm if he returns to El Salvador even though the Court does not agree that that harm rises to the level of persecution, he has not shown a nexus to a protected ground or that the harm will occur at the hands of the El Salvadoran government or an agent that the government is unwilling or unable to control. [sic]." A.R. 81. Not only is this sentence ungrammatical, it also conflates the second and third prongs of the asylum analysis -- nexus and government conduct -- with the first prong which is concerned with past or future persecution. I cannot even understand this reasoning. How could it possibly be entitled to deference?

The BIA's analysis is not much better. For its part, the BIA appears to think Petitioner's future fear of persecution was rebutted, suggesting, "even if [Petitioner] has established that he suffered harm rising to the level of past persecution when he was 14 years old, [his] present adult age constitutes a fundamental change in circumstances such that he no longer has a well-founded fear of persecution." A.R. 3 (citing 8 C.F.R. § 1208.13(b), which sets forth the rebuttable presumption). What?? This analysis is completely backward. In the first instance, this analysis misapprehends the significance of

40

Petitioner's age to this case. And it fails to provide any actual analysis of the evidence with regard to a fear of future persecution.

b.

Petitioner's age was raised by Petitioner because he has argued that, even if the past harms he suffered would not rise to the level of persecution as experienced by adults, consideration should have been given to his young age at the time of the events. Petitioner argues that the agency decisionmakers should have considered "whether the harmful acts he suffered constitute persecution when viewed from the perspective of a child." A.R. 24.

Our sister circuits have repeatedly recognized acts as persecution for child applicants even where the same conduct might not meet that standard for an adult. *See, e.g., Jorge-Tzoc v. Gonzales*, 435 F.3d 146, 150 (2d Cir. 2006) (explaining that, though the petitioner was never victimized directly, the combination of circumstances that might not suffice for an adult "could well constitute persecution to a small child totally dependent on his family and community" (citation omitted)); *Liu v. Ashcroft*, 380 F.3d 307, 314 (7th Cir. 2004) ("[A]ge can be a critical factor in the adjudication of asylum claims and may bear heavily on the question of whether an applicant was persecuted or whether she holds a well-founded fear of persecution."). Near death beatings and threats from armed men would undeniably be traumatic for any individual, but surely there can be little debate that the severity of such incidents and the reasonable perception of future harm stemming therefrom would be greater for a 14-year-old boy than for an adult man. Indeed, the Department of Justice has itself acknowledged, "[t]he harm a child fears or has suffered . . . may be relatively less than that of an adult and still qualify as persecution." U.S. Dep't

41

of Justice, Immigr. & Naturalization Serv., File No. 120/11.26, Memorandum on Guidelines for Children's Asylum Claims (1998), 1998 WL 34032561.

The substantial evidence demonstrates that Petitioner established past persecution irrespective of his age. But taking into account that Petitioner was only a child during the events in question, it becomes all the more obvious that the substantial evidence in this case compels a conclusion contrary to that reached by the IJ and BIA.

c.

Furthermore, if the BIA wanted to use Petitioner's growth to rebut a presumption of future persecution, it needed to explain why, despite a change in age, "a reasonable person would [not] have fear of persecution" in like circumstances. *Tang v. Lynch*, 840 F.3d 176, 181 (4th Cir. 2016) (quoting *Rusu v. INS*, 296 F.3d 316, 324 (4th Cir. 2002)). That is, even if it believed the underlying events did not constitute past persecution for an adult, the BIA never evaluated whether those acts would place a reasonable adult in fear of *future* persecution.

Thus, both the IJ and BIA once again failed to provide a meaningful analysis of whether Petitioner established a well-founded fear of future persecution. Having concluded that Petitioner did not establish past persecution, the agency decisionmakers simply stumbled through their determinations that he likewise did not have a fear of future persecution either, with the IJ barely providing a coherent paragraph and the BIA resorting to Petitioner's age as a "changed circumstance" in attempt to support such position.

To me, Petitioner's youth when he received the assaults and threats at issue serves to underscore the errors made by the IJ and BIA in refusing to find past persecution. And

it does not in any way undermine or rebut the presumption of future persecution to which he should be entitled on the evidence in the record. To the contrary, for these reasons, I cannot credit the IJ or BIA "analyses" of Petitioner's well-founded fear of future persecution.

C.

Last, but certainly not least, as the majority acknowledges, the Government does not dispute that the IJ and BIA erred in finding that Petitioner failed to establish a nexus between his alleged persecution and particular social group membership, merely stating that we "need not reach the agency's decision regarding nexus to a protected ground." Resp't's Br. 18 n.7. Petitioner alleges error based on the IJ and BIA determinations failing to recognize his family as a cognizable particular social group and that his family relationship to his sister is not "one central reason" for the past or future persecution he fears. A.R. 3. The BIA upheld the IJ's finding that "the harm [Petitioner] fears is motivated by an act of random criminal or gang violence, which is unrelated" to his family membership. *Id.*

Given that the Government does not contest Petitioner's allegation of error -- and given that the IJ and BIA also erred in their analyses of Petitioner's persecution and the ability of the Salvadoran government to protect him -- I dissent from the majority's decision to affirm. Rather, I would remand for the BIA to perform the correct analysis of Petitioner's past persecution, the nexus of that persecution to his family membership, the evidence that reporting MS-13's violence would have been futile or harmful, and the

43

reasons for determining that the El Salvadoran government would nonetheless be able to protect Petitioner.

IV.

The determination that the IJ and BIA erred with regard to Petitioner's asylum claim necessarily implicates their conclusions as to his claim for withholding of removal. The IJ and BIA rejected Petitioner's withholding of removal claim, reasoning that his failure to establish a claim for asylum meant that he would be unable to meet the higher evidentiary standard for withholding of removal. *See Zelaya v. Holder*, 668 F.3d 159, 161 (4th Cir. 2012) (explaining, "an [applicant] who cannot meet his burden of proof on an asylum claim cannot meet his burden of proof on a withholding of removal claim under the INA" (citation omitted)). But because the BIA rested its conclusion as to withholding of removal on its flawed asylum determination, I would also remand for reconsideration of Petitioner's withholding of removal claim consistent with the analysis set forth above.

V.

Finally, I would also remand Petitioner's CAT claim for further analysis. I cannot agree with my colleagues that the CAT analyses of the IJ and BIA adequately addressed Petitioner's "particularized risks of torture, country conditions, and mass human rights violations in the country of removal." Pet'r's Br. 21–22. As with their asylum analyses, the IJ and BIA woefully underexplain their assessment of Petitioner's argument and evidence with regard to his CAT claim.

To be eligible for CAT protection, an applicant must demonstrate that it is "more likely than not that he or she would be tortured if removed to the proposed country of

44

removal."  8 C.F.R. § 208.16(c)(2).  An applicant is not required to link the likelihood of torture to a protected ground.  *See Lizama v. Holder*, 629 F.3d 440, 449 (4th Cir. 2011).  Torture is defined as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person . . . by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity."  8 C.F.R. § 1208.18(a)(1).  Government acquiescence requires a demonstration that officials are aware of or remain willfully blind to the acts constituting torture.  8 C.F.R. § 1208.18(a)(7); *see Rodriguez-Arias v. Whitaker*, 915 F.3d 968, 971 (4th Cir. 2019).

The IJ's CAT discussion is, in full, a mere three sentences long:

> The Court has considered the 2016 and 2017 Human Rights Reports for El Salvador, as well as the articles submitted in Exhibits 5 and 6 which confirm that violence is a significant problem in El Salvador.  However, [Petitioner] has not provided evidence that shows that it is more likely than not that he specifically would be tortured in the future in El Salvador with the consent or acquiescence of the government.  For these reasons, I deny [Petitioner]'s request for relief under the CAT.

A.R. 81.  To its credit, the BIA did at least add one item of fact in its analysis, noting that Petitioner's "grandmother and sister 'believe' that the Salvadoran police are working with local MS gang members." *Id.* at 4.[2]  But otherwise, reviewing the IJ's decision for clear

---

[2] Given that the IJ's three-sentence CAT analysis was devoid of any factual findings on Petitioner's specific evidence of police corruption, the BIA was left to its own devices and failed to consider all the record evidence.  For one thing, the BIA's factual description fails to acknowledge that Petitioner's mother -- in addition to his sister and his grandmother -- attested to her understanding that the policemen who visited her house "were policemen working with the gang members . . . threatening [her] so that [Petitioner] would turn himself into the gang members."  A.R. 290.

45

error, the BIA agreed with the IJ's determination rejecting Petitioner's claim for CAT relief without any other reference to the facts.

Review of Petitioner's CAT relief claim is significantly hindered by the IJ's and BIA's scant analysis. Petitioner put forth credible evidence that he fears future persecution by MS-13 members, and he also put forth specific, credible evidence that the police have been involved in prior attempts to locate him. As we have previously explained, "the BIA's or IJ's failure to engage with an applicant's evidence hampers our ability to meaningfully review what was decided below." *Rodriguez-Arias*, 915 F.3d at 974.

Of note, we have previously rejected exactly the kind of cursory analysis performed here, holding insufficient an IJ's analysis "acknowledg[ing] that there are 'some instances of torture of gang members and former gang members by the police in El Salvador,' but then assert[ing] that the 'evidence does not support' the likelihood that the harm inflicted on [the applicant] would be with the government's acquiescence." *Rodriguez-Arias*, 915 F.3d at 974 (quoting the record in that case). And where the BIA similarly failed to engage with the applicant's evidence, we held that the "wholesale failure to *fully consider* [the applicant]'s country-conditions evidence constitute[d] reversible error." *Id.* at 975 (emphasis supplied). Likewise, I submit that here "[d]enying [Petitioner]'s claim for CAT relief required more -- much more -- from both the BIA and the IJ" than the sparse analysis provided. *Id.*

At best, the agency decisionmakers acknowledged only Petitioner's family's "belief" in police corruption without acknowledging the abundant expert evidence Petitioner submitted corroborating his testimonial evidence, including affidavits by

professional analysts explaining how MS-13 can "operate . . . largely without police or military interference because of corruption and the Salvadoran government's inability to maintain order," A.R. 387, and country reports evidence indicating the effectiveness of the national police force is hampered by "corruption and criminality," *id.* at 447.

Circuit courts, including our own, have **repeatedly** warned the BIA that it "must interact seriously with the full panoply of the risk-of-torture evidence submitted." *Rodriguez-Arias*, 915 F.3d at 975 (citing *Aguilar-Ramos v. Holder*, 594 F.3d 701, 705 (9th Cir. 2010) and *Kamalthas v. I.N.S.*, 251 F.3d 1279, 1280 (9th Cir. 2001)). "When a man's life is on the line, he is entitled to know that the court deciding his claim reviewed all his evidence, understood it, and had a cogent, articulable basis for its determination that his evidence was insufficient." *Rodriguez-Arias*, 915 F.3d at 975. A petitioner whose life is on the line deserves -- and under our precedent is entitled to -- more than the absolute disregard of his relevant evidence exhibited in the IJ and BIA opinions here. The BIA and IJ fail to provide adequate analysis when they limit review of the evidence only to country condition reports and ignore an applicant's particularized evidence. *See Cabrera Vasquez v. Barr*, 919 F.3d 218, 223–24 (4th Cir. 2019) (remanding where "[a]lthough the IJ found [the petitioner] credible, the BIA's order lack[ed] any meaningful engagement with her testimony" and relied exclusively on country condition reports "that 'showed the government was making efforts to fight the gangs in El Salvador'" (quoting the record in that case)).

Therefore, I would remand Petitioner's CAT relief claim with instruction to engage with the evidence provided beyond just the country reports and the BIA's one liner about

47

Petitioner's family's beliefs. Petitioner detailed numerous threats as well as physical assaults on his person. He also presented evidence that the government officials responsible for protecting him are possibly in league with his would-be torturers. The IJ's and BIA's respective failures to acknowledge this evidence and apply our CAT precedent to it is error and warrants remand.

VI.

In conclusion, I borrow from the majority opinion, which likens the standard of review to an offensive lineman in football. In light of the limited analyses below, which were at worst nonsensical and cursory at best, the standard of review "offensive lineman" in this case cannot protect the decision below. Instead, the weak analysis of the agencies left their blind side wide open.

I dissent.